UNITED STATES of America

v.

**M/V BIG SAM, in rem, Tri-Capt, Inc., Zito Towing, Inc., ABC Insurance Co., T/B BUTANE, in rem, Keith S. Edwards, and Water Quality Insurance Syndicate.**

**Civ. A. No. 78–86.**

United States District Court, E. D. Louisiana.

Jan. 22, 1981.

---

10. In view of the finding of invalidity based on 35 U.S.C. § 102(b), it is unnecessary to discuss C-E's other grounds of invalidity.

John P. Volz, U. S. Atty., Leonard P. Avery, Asst. U. S. Atty., New Orleans, La., James A. Lewis, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for plaintiff United States of America.

Normand R. Pizza, Reuter & Reuter, New Orleans, La., for defendants M/V BIG SAM and Zito Towing, Inc.

Thomas J. Wagner, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for defendant Mission Insurance Co.

HEEBE, Chief Judge:

On April 25, 1975, the M/V BIG SAM collided with an oil-carrying barge, the T/B BUTANE, in the Mississippi River and caused a substantial oil spill. The United States cleaned up the oil spill. Suit was filed on the collision, which included all parties to the collision as litigants. Judgment was rendered in the suit on April 29, 1977. The Findings of Fact and Conclusions of Law reached in that suit, *Naptha Barge Co. v. Continental Navigation Co.*, No. 75–1281 (E.D.La.), have been stipulated to by the parties and agreed to as binding on them for the purposes of this suit.

The United States declined the request of the parties to the *Naptha Barge* case to join in that suit and, instead, on January 10, 1978, filed the instant suit to recover its expenses in cleaning up the oil spill that resulted from the collision of the M/V BIG SAM with the barge T/B BUTANE. Although the suit was originally brought on several different bases, this Court, on November 30, 1979, held that the United States had only one basis on which to recover for its cleanup activities and that was under the Federal Water Pollution Control Act, 33 U.S.C. § 1321 (1973). *United States v. M/V BIG SAM*, 480 F.Supp. 290 (E.D.La. 1979). This view was subsequently affirmed on the appeal of another case in *United States v. Dixie Carrier, Inc.*, 627 F.2d 736, 742 (5th Cir. 1980), where the court categorically held that:

> In the absence of a clearer indication from Congress that the government may obtain recovery under additional theories, we conclude that the balanced and com-

prehensive scheme in 1321(f)(1) provides the exclusive remedy for the government to recover its cleanup costs from oil spills. In the *Dixie Carrier* case, the oil spill occurred when a tugboat lost control of the tanker barges in its tow and one of them struck a bridge, discharging over a million gallons of oil into the Mississippi River. Consequently, § 1321(f)(1) of the FWPCA, which provides for recovery by the government of cleanup costs from the "owner or operator of any vessel from which oil . . . is discharged," was the applicable section of the Act for that case.

However, it is agreed in this case that the owner of the vessel, Zito Towing, Inc., had bareboat chartered the M/V BIG SAM to Tri-Capt, Inc., which was the sole operator of the vessel at the time it collided with the oil barge T/B BUTANE, which was then in the tow of the tugboat M/V LETHA C. EDWARDS, Zito Towing did not operate the BIG SAM at any time relevant to this occurrence. The court, in the *Naptha Barge* case, found that the M/V BIG SAM, while under bareboat charter to Tri-Capt, Inc., was the sole proximate cause of the collision and consequent discharge of oil from the BUTANE into the river. Therefore, 33 U.S.C. § 1321(g) of the FWPCA, which applies to third-party liability, rather than subsection (f) of the Act, is applicable here. Section 1321(g) comes into play under an exception to § 1321(f)(1) which provides a defense to the owner or operator of a discharging vessel where such "owner or operator can prove that a discharge was caused solely by . . . an act or omission of a third party . . . ." Section 1321(g) provides, in pertinent part, that:

> where the owner or operator of a vessel . . . proves that such discharge of oil or hazardous substance was caused solely by an act or omission of a third party . . . such third party shall, notwithstanding any other provision of law, be liable to the United States Government for the actual costs incurred under subsection (c) of this section for removal of such oil or substance by the United States Government. . . . The United States may bring an action against the third party in any

court of competent jurisdiction to recover such removal costs.

Although the actual costs of the cleanup to the United States exceeds the amount, liability under the FWPCA is limited to $15,-500, i. e., $100 times the 155 gross ton weight of the M/V BIG SAM. 33 U.S.C. § 1321(g) (1973). The government is not claiming that the discharge of oil was the result of willful negligence or willful misconduct within the privity or knowledge of a third party and is therefore limited to the maximum statutory amount under section 1321(g).

Having held that the FWPCA is the sole basis for the government to recover its cleanup costs, we are left with two final questions in this case. The *first*, in two parts, is (1) whether the FWPCA, under section 1321(g), establishes liability against the M/V BIG SAM, *in rem*, and (2) whether it establishes liability against the owner of the M/V BIG SAM, Zito Towing, Inc., under the facts of this case. The *second* is whether the United States is entitled to recover prejudgment interest on its award under the FWPCA. Initially, there was also a question as to whether Mission Insurance Co., the insurer of the M/V BIG SAM for Zito Towing, could be held liable. However, it was subsequently agreed by the government that its insurance provided protection and indemnity coverage, but not insurance against FWPCA claims.

### 1. *Action In Rem*

The FWPCA under section 1321(f)(1) expressly provides for a lien against the discharging vessel. The section states that the costs recoverable by the government:

> shall constitute a maritime lien on such vessel which may be recovered in an action in rem in the district court of the United States for any district within which any vessel may be found. The United States may also bring an action against the owner or operator of such vessel in any court of competent jurisdiction to recover such costs.

Even though section 1321(g) is devoid of any similar language which would provide for a right to bring an action in rem when a third-party vessel causes the discharge of oil, the United States takes the position that admiralty courts can infer appropriate remedies when necessary and that this would include inferring a maritime lien when a vessel is a principal in an act or omission that causes a discharge. The case of *State of California v. S. S. Bournemouth*, 307 F.Supp. 922, at 926 & 929 (C.D.Cal. 1969), is relied on as authority for this position. We do not think that the *Bournemouth* case gives such support. In that case, in which the state had filed a complaint in rem against a vessel to recover damages incurred because the vessel was discharging oil into the state's navigable waters, the court held that the complaint stated a maritime cause of action in tort giving rise to a maritime lien and consequent suit in rem in admiralty, independent of any statute. We have held to the contrary with respect to an independent maritime tort claim. However, the court in *Bournemouth*, supra at 924, did note that if the complaint had been brought pursuant to sections 151 and 152 of the California Harbors and Navigation Code, the plaintiff would have not been entitled to proceed in rem since the statute does not provide for a lien on the offending vessel and "a maritime lien is a necessary condition to a suit in rem in admiralty." The court did not attempt to read an implied right to a maritime lien into the statute as the government requests us to do here.

■ The government also relies on the fact that in this Court's decision on reconsideration of *United States v. M/V BIG SAM*, 454 F.Supp. 1144 (E.D.La.1978), in which the Court restricted the United States to the FWPCA claim alone, the Court continued in existence the lien established in the earlier decision, however limited to the amount recoverable under the FWPCA claim. But, in this second opinion, the Court, supra, 480 F.Supp. at 291, carefully limited the reconsideration to two issues, namely, whether the United States had claims under maritime tort or under the Refuse Act in addition to that under the FWPCA. In reducing the amount of the bond required, the Court, supra, stated this was being done pursuant to a specific request on the part of Zito Towing and the M/V BIG SAM and that its only decision was limited to a holding "that the United States has one cause of action against the parties, and that it is pursuant to the FWPCA." Considering the fact that Congress did provide for a maritime lien, and accompanying action in rem, in subsection (f) but not in subsection (g), we can only conclude that it did not intend to provide for actions in rem under subsection (g). We therefore hold that the United States is not entitled to bring an action in rem against the M/V BIG SAM pursuant to section 1321(g).

### 2. *Liability of Zito Towing*

■ As previously stated, it is stipulated that Zito Towing owned the M/V BIG SAM and Tri-Capt operated it as a bareboat charterer at the time of the collision which caused the discharge of oil from the T/B BUTANE. It is further stipulated that the sole cause of the collision and ensuing discharge was the negligent manner in which the M/V BIG SAM was operated. It is clear from the *Naptha Barge* decision that there was nothing inherently wrong with the vessel, itself, which caused the accident. As a matter of fact, the operator hired by Tri-Capt to navigate the M/V BIG SAM was found by the Coast Guard, after the accident, to be in violation of 46 U.S.C. § 405 in that he did not hold the proper license to navigate the tugboat in the waters where the accident occurred. The Coast Guard assessed a penalty against Tri-Capt for this violation.

The government, however, asserts that, in addition to Tri-Capt, Zito Towing should also be liable to it for the costs of the cleanup of the oil spill, as limited, because third-party liability should be read as joint and several for both the third-party vessel owner and operator. Section 1321(g) provides for liability on the "owner or operator." The statute, 33 U.S.C. § 1321(a)(6),

defines "owner or operator" as "in the case of a vessel, any person owning, operating, or chartering by demise, such vessel." And, according to the government, liability is joint and several because this definition provides inclusive, rather than mutually exclusive, alternatives. We disagree with the government's position. We read the statute as being in the disjunctive and giving a choice of parties, depending on the existing facts. Subsection (g) requires proof that the offending discharge was *caused* by the act or omission of the third party to be charged. This same language is carried through in the provision of exoneration from liability of the offending vessel in section 1321(f)(1), which requires the owner or operator to prove that the discharge was caused solely by the act or omission of a third party. Under our existing facts there is only one third party which caused the discharge and that is Tri-Capt. There could, of course, be circumstances where both owner and operator of a vessel are actually or technically at fault. But that is clearly not the case here.

The government also relies on the recent case of *United States v. LeBeouf Brothers Towing Company*, 621 F.2d 787 (5th Cir. 1980), in support of its argument for joint liability on owner and operator, without more. In *LeBeouf*, a tanker barge owner sought to be exonerated under section 1321(f)(1) on the basis that the tugboat hired by LeBeouf to tow its tanker barge to a specified location was a "third party." The offending discharge occurred when a crewman of the hired tugboat accidentally opened the wrong valve on the tanker barge and discharged oil onto the Mississippi River. The Fifth Circuit was deciding the case under section 1321(f)(1), which provides that an "owner or operator of *any vessel from which oil* or a hazardous substance *is discharged* . . . shall, notwithstanding any other provision of law, be liable to the United States Government . . . ." The court refused to let the owner of the tanker barge from which the oil was discharged out from liability for cleanup costs under section 1321(f)(1) because it recognized the legislative purpose in drafting

section 1321(f)(1) as a strict liability statute. Therefore, the court refused to find that the tugboat was a "third party" for the purpose of relieving the owner of the vessel from which the oil spill occurred from liability. It found support for this in the case of *Burgess v. M/V Tamano*, 564 F.2d 964, 981–82 (1st Cir. 1977), in which the court similarly refused to find that a temporary local pilot, who negligently ran a supertanker into a submerged ledge in a Maine harbor, was a "third party" under section 1321(f)(1) for the purpose of relieving the owner of the supertanker from liability for the oil spill which occurred. This legislative purpose was also recognized by the Fifth Circuit in the *Dixie Carriers* case, supra at 739–740, where the court noted that the provision for limited recovery under section 1321(f)(1) was matched to strict liability, as compared to that section's provision for unlimited recovery with proof of willful conduct. That the intent was to impose strict liability on the discharging vessel is clear from the legislative history, discussed as follows:

> Under absolute liability with limits, a vessel owner would be absolutely liable regardless of fault, but the injured party would be limited in the amount of the damages which could be collected. This approach avoids the difficult, if not impossible, task of proving negligence or rebutting the case for nonnegligence made by the vessel owner. It also places the risk on the responsible party, not on the general public.
>
> It should be noted that the insurance industry and the oil industry testified that they could not imagine a circumstance where a discharge of oil would occur without some degree of negligence. Therefore, it appears that negligent liability with a reverse burden of proof and absolute liability are similar in practical application. The practical advantage to absolute liability, of course, is that it would avoid litigation with the vessel owner on the question of responsibility.
>
> The oil pollution section deals only with the matter of clean up of discharges and

costs associated therewith. The bill in no ways affects the right of third parties against the party causing the discharge. S.Rep.No. 91–351, 91st Cong., 1st Sess. 5 (1969).

On the other hand, all parties agree that the case before us falls under section 1321(g), which provides that where an owner or operator of a vessel from which oil is discharged "proves that such discharge of oil ... *was caused* solely by an act or omission of a *third party* ... such *third party* shall, not withstanding any other provision of law, be liable to the United States Government for the actual costs incurred ... for removal of such oil ... or substance by the United States Government," subject to the same limitation as found in section 1321(f). The limitation provision does provide that, if the third party is the owner or operator of a vessel which causes the discharge of oil, the liability of such third party is based on the tonnage of the vessel owned or operated by the third party. This third-party situation refers to actual cause, and the legislative history reflects that it covers situations where a third party causes an unrelated, oil-carrying vessel to spill oil. *United States v. LeBeouf Brothers Towing Co.*, supra at 789; S.Rep.No. 91–351, 91st Cong., 1st Sess. 6 (1969). Additionally, in *LeBeouf*, the court found that LeBeouf had retained ultimate control over the tugboat which it hired to tow its barge and noted that the *Burgess* court also found that the local pilot was subject to the ultimate control of the ship and was acting for the ship. In the instant case, Zito Towing retained no control over the BIG SAM and the vessel was not on the business of the owner, Zito Towing. Our case, therefore, is factually distinguishable from these two cases which were decided under section 1321(f)(1).

■ Under the stipulated facts, there is no question that the third party which caused the oil spill in this case was Tri-Capt, the bareboat charterer and owner pro hac vice of the BIG SAM, and not Zito Towing, the owner of the vessel. Consequently, we cannot hold, as the government requests, that Zito Towing is liable to the government for cleanup costs under section 1321(g). We are aware that Tri-Capt is insolvent and the government may not be able to collect on a judgment against it. However, we cannot use this as an excuse to distort the language or history of the statute.

### 3. *Prejudgment Interest*

The United States requests the Court to grant prejudgment interest on the amount recoverable under the statute from the date of its expenditure of funds for cleanup of the oil spill on June 24, 1975. The defendants object to an award of prejudgment interest, but basically on the facts of the case. It is their position that shortly after the underlying collision occurred, on April 25, 1975, the private litigation was initiated. Prior to trial of the suit, in February 1977, the United States made informal claim on the private litigants for cost of removal of the oil spill. Because the government was informed of the pending collision litigation and also was requested to intervene in it to present its claim and chose not to, the defendants feel that it should not be entitled to prejudgment interest at this time. It is argued that the government waited until January 10, 1978, almost a year after trial on the collision litigation then pending and three years after the actual collision and oil cleanup activity, to bring suit. Defendants take the position that since the government caused the delay between its expenditure of funds and the judgment in this litigation, interest should be allowed only from the date of this Court's judgment.

■ There is no question that, pursuant to 28 U.S.C. § 1961, the United States is entitled to interest on its judgment. However, this applies only to interest on the judgment itself and leaves open the question of granting prejudgment interest as part of the compensation to be awarded the government. *Louisiana & Arkansas Railway Co. v. Export Drum Co.*, 359 F.2d 311 (5th Cir. 1966). Two courts have dealt with this question. In *United States v. M/V Zoe Colocotroni*, 602 F.2d 12, 14 (1st Cir. 1979),

also an action by the United States to recover the cost of oil spill cleanup, the court held that the question of prejudgment interest on the government's unliquidated claim lay in its discretion and approved the award of prejudgment interest from the date the United States first presented a bill to defendants. Its decision was based on general principles of admiralty law. The court in *United States v. Malitovsky Cooperage Co.*, 472 F.Supp. 454 (W.D.Pa.1979), also held that it had discretion as to whether to award prejudgment interest on an award to the government to cover the cost incurred in a cleanup operation. As in the *M/V Zoe Colocotroni* case, supra, this court awarded prejudgment interest from the date the Coast Guard made its demand on the defendant for payment of the bill for cleanup costs. However, the oil spill in this latter case occurred on land, oil having emanated from a steel drum-reconditioning plant. Although the court was confronted with the same statute, 33 U.S.C. § 1321, it did not rely on principles of admiralty law to reach its decision. It relied on general principles of federal law, which, however, also rests the determination of awards of interest on unliquidated claims in the discretion of the court. On either basis the same conclusion was reached. Having found that Tri-Capt is solely liable to the government for the cost of cleaning up the oil spill which it caused, we are now left with a determination of this question of prejudgment interest. Agreeing that it is within our sound discretion, we also think that interest should be paid by Tri-Capt from the date claim was made on it by the United States in February of 1977, without making them responsible for the time lapse between the government's expenditure and its request for reimbursement. Also on the authority of both cited cases, *United States v. M/V Zoe Colocotroni*, supra at 14, and *United States v. Malitovsky Cooperage Co.*, supra at 458, we award this interest at the legal rate prevailing in Louisiana, as requested by the United States.

Finally, the United States seeks to recover against Tri-Capt the sum of $500, representing Tri-Capt's liability for the penalty assessed against it by the Coast Guard under 46 U.S.C. § 405, which has been previously described. We agree that Tri-Capt, Inc., is liable to the United States in the amount of $500 for violation of this statute.

Accordingly,

IT IS THE ORDER OF THE COURT that there be judgment in favor of plaintiff United States of America against defendant Tri-Capt, Inc., under the Federal Water Pollution Control Act, 33 U.S.C. § 1321, for $15,500, plus 7% interest from February, 1977, until paid.

IT IS THE FURTHER ORDER OF THE COURT that there be judgment in favor of plaintiff United States of America against defendant Tri-Capt, Inc., in the sum of $500, representing the penalty for violation of 46 U.S.C. § 405.

IT IS THE FURTHER ORDER OF THE COURT that there be judgment in favor of defendants M/V BIG SAM and Zito Towing, Inc., and against the plaintiff United States of America, DISMISSING the plaintiff's suit against them.