**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**M/V BIG SAM, in rem, et al.,
Defendants-Appellees.**

No. 81–3127.

United States Court of Appeals,
Fifth Circuit.

July 30, 1982.

Rehearing and Rehearing En Banc
Denied Dec. 13, 1982.

Wendy M. Keats, Leonard Schaitman, Attys., Civ. Div., Appellate Staff, Dept. of Justice, Thomas W. Snook, Allen Van Emmerick, Civ. Div., Torts Branch, Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Normand F. Pizza, New Orleans, La., for M/V Big Sam and Zito Towing Co.

Thomas J. Wagner, Richard A. Sabalot, New Orleans, La., for Mission Ins. Co.

Before WISDOM, RANDALL and TATE, Circuit Judges.

TATE, Circuit Judge:

The United States appeals from the dismissal of its suit against the Motor Vessel BIG SAM and its owner to recover oil spill cleanup costs. It is conceded that the sole fault of the accident was the negligent operation of the BIG SAM, which struck a tanker barge and caused the discharge of substantial quantities of oil. The district court held that liability for the cleanup costs was exclusively governed by section 311(g) of the Federal Water Pollution Control Act ["the Act"], 33 U.S.C. § 1321(g), and that under this section the sole party responsible was the insolvent bareboat charterer of the BIG SAM.

We reverse, holding (1) that both owner and charterer of the sole-fault, non-discharging vessel are liable under § 1321(g), (2) that this statutory section does not exclude an in rem remedy, and (3) that any maritime tort remedy of the United States against the negligent vessel is not preempted by § 1321(g), in view of the express provision of 33 U.S.C. § 1321(h)(2) that the liabilities established by the Act "shall in no way affect any rights which . . . the United States Government may have against any third party whose actions may in any way have caused or contributed to the discharge of oil or hazardous substance."

*Factual Context of the Issues*

The case originated out of a collision in the Mississippi River between the M/V BIG SAM and the T/B BUTANE, April 25, 1975, which resulted in hull damages to and oil spill from the BUTANE. The BIG SAM is a twin screw towboat, 155 gross tons, which at the time of the collision was owned by Zito Towing, Inc. and bareboat chartered by Tri-Capt, Inc. Due to negligent navigation and an inexperienced pilot, the BIG SAM collided with the tank barge BUTANE, owned and operated by Delta Barge Line. The collision caused 280,000 gallons of oil to be discharged from the BUTANE. Delta Barge Line immediately began cleanup operations. After spending over $50,000 in cleaning up and protecting water intakes, Delta turned the operation over to the U. S. Coast Guard, which spent almost $300,000 more to finish cleaning up the spill.

The United States brought this suit against the BIG SAM (in rem), Zito (its owner), and Tri-Capt (the vessel's bareboat charterer),[1] alleging causes of action based upon (a) § 1321(g) of the Act, (b) the Refuse Act, 33 U.S.C. § 407, and (c) general negligence (maritime tort law), to recover its cleanup costs. The findings in litigation between the private parties were stipulated,[2] under which the sole cause of the collision was the negligence of the BIG SAM,

---

1. The United States initially also sued the BUTANE (the discharging vessel) and Delta, its owner and operator. The government does not complain of the dismissal of these parties from the suit, as exculpated from liability because the negligence of the BIG SAM was the sole cause of the collision. *See* § 1321(f), quoted in note 5 below.

2. *See Naptha Barge Co. v. Continental Navigation Co.*, 1978 A.M.C. 501, No. 75–1281 (E.D. La.1977). In this suit, Delta (the owner of the discharging vessel BUTANE) recovered from Tri-Capt (the bareboat charterer of the BIG SAM) damages, civil penalties paid to the Coast Guard under § 1321(b), costs expended to protect water intake, and the *initial and*

the non-discharging third-party vessel. The district court held that liability was determined exclusively by § 1321(g); that under that section no in rem remedy against the vessel was recognized; and that under § 1321(g) Tri-Capt, the bareboat charterer (by now insolvent), was solely at fault and that it alone was thus liable in the amount of $15,500, the limit of liability under the circumstances as provided by § 1321(g).[3]

The government contends that the district court erred in not affording an in rem remedy against the solely negligent vessel, and in its holding that § 1321(g) of the Act provided the exclusive remedy against a third-party non-discharging vessel solely at fault. Before reaching these contentions, we will set forth briefly an overview of sections of the Act relevant to the issues before us.

*The Statutory Scheme*

The issues before us on this appeal are essentially ones of statutory construction.

Involved are not only what remedies were intended by Congress in passing the Act, but as well what remedies were foreclosed.

The Act, 33 U.S.C. §§ 1251–1376, was originally enacted as the Water Quality Improvement Act of 1970, Pub.L.No.91–224, with relevant provisions reenacted as part of the Federal Water Pollution Control Act Amendments of 1972.[4] The Act prohibits the discharge of oil into the navigable waters of the United States, 33 U.S.C. § 1321(b)(1). The government is authorized to clean up any oil spill not properly removed by the discharger, 33 U.S.C. § 1321(c)(1), including the emergency power to remove, and if necessary destroy, the discharging vessel, 33 U.S.C. § 1321(d).

The Act imposes liability for cleanup costs on "dischargers," and cleanup costs incurred by the government are recoverable under § 1321(f)(1), (2), (3)[5] from the discharging vessel or facility. If, however (as

---

*aborted cleanup costs incurred by Delta.* The right to recover the latter is expressly recognized by § 1321(h), which provides

The liabilities established by this section shall in no way affect any rights which (1) the owner or operator of a vessel or of an onshore facility or an offshore facility may have against any third party whose acts may in any way have caused or contributed to such discharge, or ....

The United States strongly argues that likewise its own cleanup costs were preserved by the remainder of this subsection § 1321(h)(2), which similarly provides that the liability established in § 1321 "shall in no way affect any rights which ... (2) the United States Government may have against any third party whose actions may in any way have caused or contributed" to the discharge.

3. The district court's opinions to this effect are reported at 505 F.Supp. 1029 (E.D.La.1981) and 480 F.Supp. 290 (E.D.La.1979). These opinions reversed an earlier determination by the district court that the remedy provided by the Act was not exclusive. 454 F.Supp. 1144 (E.D.La. 1978).

4. The Act as re-enacted in 1972 was applicable to this 1975 accident. Subsequent to 1975 the Act has been amended by the Clean Water Act of 1977, with additional amendments in 1978 and 1980. None of the amendments concern issues presented by this appeal.

5. 33 U.S.C. § 1321(f)(1)–(3) presently provides:

(f)(1) Except where an owner or operator can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses, such owner or operator of any vessel from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section shall, notwithstanding any other provision of law, be liable to the United States Government for the actual costs incurred under subsection (c) of this section for the removal of such oil or substance by the United States Government in an amount not to exceed, in the case of an inland oil barge $125 per gross ton of such barge, or $125,-000, whichever is greater, and in the case of any other vessel, $150 per gross ton of such vessel (or, for a vessel carrying oil or hazardous substances as cargo, $250,000), whichever is greater, except that where the United States can show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner, such owner or operator shall be liable to the United States Government for the full amount of such costs. Such costs shall constitute a maritime lien on such vessel which may be recovered in an action in rem in the district court of the United States for any district within which any vessel may be found. The United States may also bring an

here), the sole cause of the accident is the act or omission of a third party, the government is permitted to recover its cleanup costs from such sole-cause third-party. § 1321(g)[6]. The Act also expressly pro-

action against the owner or operator of such vessel in any court of competent jurisdiction to recover such costs.

(2) Except where an owner or operator of an onshore facility can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses, such owner or operator of any such facility from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section shall be liable to the United States Government for the actual costs incurred under subsection (c) of this section for the removal of such oil or substance by the United States Government in an amount not to exceed $50,000,000, except that where the United States can show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner, such owner or operator shall be liable to the United States Government for the full amount of such costs. The United States may bring an action against the owner or operator of such facility in any court of competent jurisdiction to recover such costs. The Administrator is authorized, by regulation, after consultation with the Secretary of Commerce and the Small Business Administration, to establish reasonable and equitable classifications of those onshore facilities having a total fixed storage capacity of 1,000 barrels or less which he determines because of size, type, and location do not present a substantial risk of the discharge of oil or a hazardous substance in violation of subsection (b)(3) of this section, and apply with respect to such classifications differing limits of liability which may be less than the amount contained in this paragraph.

(3) Except where an owner or operator of an offshore facility can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses, such owner or operator of any such facility from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section shall, notwithstanding any other provision of law, be liable to the United States Government for the actual costs incurred under subsection (c) of this section for the removal of such oil or substance by the United States Government in an amount not to exceed $50,000,000, ex-

cept that where the United States can show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner, such owner or operator shall be liable to the United States Government for the full amount of such costs. The United States may bring an action against the owner or operator of such a facility in any court of competent jurisdiction to recover such costs.

*See also*: Annot., 56 A.L.R.Fed. 346 (1982).

**6.** At the time of the accident in 1975, § 1321(g) provided as follows:

"(g) In any case where an owner or operator of a vessel, of an onshore facility, or of an offshore facility, from which oil or a hazardous substance is discharged in violation of subsection (b)(2) of this section, proves that such discharge of oil or hazardous substance was caused solely by an act or omission of a third party, or was caused solely by such an act or omission in combination with an act of God, an act of war, or negligence on the part of the United States Government, such third party shall, notwithstanding any other provision of law, be liable to the United States Government for the actual costs incurred under subsection (c) for removal of such oil or substance by the United States Government, except where such third party can prove that such discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of another party without regard to whether such act or omission was or was not negligent, or any combination of the foregoing clauses. If such third party was the owner or operator of a vessel which caused the discharge of oil or a hazardous substance in violation of subsection (b)(2) of this section, the liability of such third party under this subsection shall not exceed $100 per gross ton of such vessel or $14,000,000, whichever is the lesser. In any other case the liability of such third party shall not exceed the limitation which would have been applicable to the owner or operator of the vessel or the onshore or offshore facility from which the discharge actually occurred if such owner or operator were liable. If the United States can show that the discharge of oil or a hazardous substance in violation of subsection (b)(2) of this section was the result of willful negligence or willful misconduct within the privity and knowledge of such third party, such third party shall be liable to the United States Government for the full amount of such removal costs. The United States may bring an action against the third party in any court of competent jurisdiction to recover such removal costs.

vides that the liabilities thereby provided "shall *in no way* affect any rights" that a discharging vessel or facility, *or the United States,* may have against any third party whose acts "may *in any way* have caused or contributed to the discharge." § 1321(h) (emphasis supplied).[7]

A primary issue of this appeal is the interrelationship between subsections (f), (g), and (h), with regard to the liability of a sole-cause non-discharging vessel. These subsections, as re-enacted in 1972 by the Act, are essentially the same as those originally enacted by section 11(f), (g), and (h) of the Water and Environmental Quality Improvement Act of 1970, Pub.L. 91–224, 84 Stat. 91. Committee reports [8] and debates relating to the enactment of these predecessor provisions have been considered as the source of the legislative history of these subsections (f), (g), and (h), although the 1972 committee reports also referred to them without illuminating expression.[9]

Subsection (f) imposes a strict liability standard under which the United States may recover from a discharger its cleanup costs up to stated limits without a showing of fault. The discharger may, however, escape this strict liability if he shows that the discharge was caused solely by an act of God, an act of war, negligence on the part of the United States—or an act or omission of a third party. On the other hand, if the United States proves that the discharge "was the result of willful negligence or willful misconduct within the privity and knowledge of the owner," the owner is liable to the United States for the full amount of the cleanup costs.

Subsection (g) comes into play when the discharger proves that the discharge "was caused solely by an act or omission" of a third party *"without regard to whether such act or omission was or was not negligent."* If the discharger can so prove, then the third party is liable for cleanup costs up to stated limits (a strict liability, without fault)—in the case of a vessel, as of 1975

---

The subsection was amended in 1977 by Pub.L. 95–217, the Clean Water Act of 1977, in respects immaterial to the present action, including a sentence added to precede the subsection as originally enacted, as follows:

> Where the owner or operator of a vessel (other than an inland oil barge) carrying oil or hazardous substances as cargo or an onshore or offshore facility which handles or stores oil or hazardous substances in bulk, from which oil or a hazardous substance is discharged in violation of subsection (b) of this section, alleges that such discharge was caused solely by an act or omission of a third party, such owner or operator shall pay to the United States Government the actual costs incurred under subsection (c) of this section for removal of such oil or substance and shall be entitled by subrogation to all rights of the United States Government to recover such costs from such third party under this subsection.

The legislative reports show that the latter amendment was adopted to assure "that the Government can pursue the insurer or the spiller to recover cleanup costs without awaiting final disposition of all third-party damage claims." S.Rep.No.95–370, 95th Cong., 1st Sess. 64, *reprinted in* [1977] U.S.Code Cong. & Ad.News 4326, 4389.

7. 33 U.S.C. § 1371(h) provides:
> The liabilities established by this section shall in no way affect any rights which (1) the owner or operator of a vessel or of an

onshore facility or an offshore facility may have against any third party whose acts may in any way have caused or contributed to such discharge, or (2) the United States Government may have against any third party whose actions may in any way have caused or contributed to the discharge of oil or hazardous substance.

8. The Conference Report No. 91–940 (to accompany H.R. 4148, which became the 1970 Act, P.L.No.91–224), *reprinted in* [1970] U.S. Code Cong. & Ad.News 2691, 2712, deals with the conference substitute section 11, which became section 11(f), (g), and (h) of the 1970 Act. The Conference Report merely restates the substance of the sections without illuminating explanation. *Id.* at 2724–26. As noted in the text, the present subsections (f), (g) and (h) retain essentially the same language as the 1970 Act.

9. Section 311 of the Federal Water Pollution Control Act Amendments of 1972, P.L.No.92–500, 86 Stat. 816, essentially retained the existing law with regard to oil spills, but increased the maximum liability. The Conference Report No. 92–1236, *reprinted in* [1972] U.S.Code Cong. & Ad.News 3668, 3776, merely states without explanation (except as to changes in liability limits) the substance of section 311 of the 1972 Act (33 U.S.C. § 1321), *id.* at 3810.

438

the statutory liability of the "owner or operator ... shall not exceed $100 per gross ton of such vessel or $14,000,000, whichever is the lesser." However, if the United States can prove that the discharge was "the result of willful negligence or willful misconduct within the privity and knowledge of such third party," then the United States may recover from the third party for the full amount of its cleanup costs. Subsection (g) (see note 6) does not expressly recognize an in rem remedy for cleanup costs as a maritime lien, as does subsection (f)(1) (see note 5) with respect to the discharging vessel.

Subsection (h) relates only to third parties whose acts "in any way" caused or contributed to the discharge. It provides that the liabilities established by the Act "shall in no way affect any rights" against such third party that either the discharging vessel-facility or the United States may have.

*Subsection (g), third-party liability.*

The principal issue raised with regard to third-party liability is whether subsection (g) provides the exclusive remedy for the government's recovery of oil-spill cleanup costs. Before reaching that issue, however, we will first decide two subsidiary issues of statutory interpretation with regard to that subsection's imposition of strict (no fault) liability upon a third-party vessel whose act or omission was the sole cause of a discharge: (1) whether the Act contemplated that *either* the owner of the non-discharging vessel *or* the operator (the bareboat charterer) shall be so liable, or whether instead the statutory terms contemplate joint and several liability; and (2) whether subsection (g)'s silence as to an in rem remedy against a non-discharging third-party vessel, precludes an admiralty court from affording one to the government? No

decision cited to us has touched upon these issues other than the opinion of the district court in the present case.

(1) *Liability of "owner or operator"*: Subsection (g), which emerged from the 1970 Congressional conference committee without explanation, speaks in terms of the liability of the "owner *or* operator" of the non-discharging third-party vessel. Noting that this liability is expressed in the disjunctive, the able district court interpreted it as "giving a choice of parties, depending on the existing facts." 505 F.Supp. at 1033. Finding that under the existing facts the only third-party whose act or omission caused the discharge was Tri-Capt (the bareboat charterer, in exclusive control of the vessel), the district court held that within the meaning of the statute that Tri-Capt was the only third party whose act or omission had caused the accident.

▮ In our opinion, the conclusion by the district court errs in regarding the term "owner and operator of a vessel" as disjunctively differentiating liability. This interpretation overlooks that the term "owner and operator" is a term of art in the statute that, as specifically defined therein, means "*any* person owning, operating, or chartering by demise" the vessel in question. 33 U.S.C. § 1321(a)(6).[10]

As statutorily defined, the term "owner or operator" refers both to the owner and to the bareboat charterer, and thus in our opinion subsection (g) affords the government a remedy against either or both. Having in mind the intent of the Act to provide an effective remedy through strict liability for recovering cleanup costs from oil spills on navigable waters, it would seem that this construction is more consistent with the legislative purpose than one that would permit an offending vessel or its owners to insulate themselves from liability

---

**10.** Section 1321(a) provides as follows:

(a) For the purposes of this section [1321] the term—

. . . . .

(6) "owner or operator" means (A) in the case of a vessel, any person owning, operating, or chartering by demise, such vessel, and (B) in the case of an onshore facility, and an

offshore facility, any person owning or operating such onshore facility or offshore facility, and (C) in the case of any abandoned offshore facility, the person who owned or operated such facility immediately prior to such abandonment;

. . . . .

through a bareboat charter to, as here, an impecunious and uninsured charterer. *See United States v. Lebeouf Bros. Towing Company,* 621 F.2d 787 (5th Cir. 1980) (rejecting a similar attempt under subsection (f) to impose a third-party defense between the owners of the *discharging* vessel (a tanker barge) and the tugboat (the alleged third party) towing it, on the basis that the act or omission of the tugboat was that of an interposed third party).

Section 1321(p) of the Act requires each vessel to maintain evidence of financial responsibility to meet the liability to which it could be subjected under § 1321. Zito, the owner of the BIG SAM, argues that 46 C.F.R. § 542.4(a), the federal regulation implementing § 1321(p), now prevents the non-operating owner from applying for a certificate of financial responsibility and, therefore, from protecting its interest against oil pollution liability.[11] Although an applicant for such a *certificate* can establish evidence of financial responsibility in several ways, one of which is with insurance, 46 C.F.R. § 542.8, nevertheless, while the regulation does not *require* the *owner* to secure vessel insurance, neither does it *prohibit* him from doing so. If the owner is assured that the operator has in fact secured such insurance, a matter of course allocable by contractual responsibility, then obviously it need not do so.

We therefore find that the liability of the owner and the operator under subsection (g) is not alternative but is instead joint and several.[12]

(2) *In rem remedy against the non-discharging vessel*: In disallowing an in rem remedy, the district court persuasively noted: (*a*) while an in rem remedy is expressly recognized against the *discharging* vessel by subsection (f), subsection (g) is silent as to the availability of such a remedy against (as here) the non-discharging third-party vessel; (*b*) that, due to the exclusive remedy provided by the Act (a holding we disapprove below), no independent maritime tort has been created that would give rise to a maritime lien. 505 F.Supp. 1031–32.

 *As to (a),* we should first note that the inclusion of in rem language in subsection (f) is indicated by the conference report as clarifying the existence of the remedy, not as creating it.[13] If the omission of similar clarifying language in subsection (g) was deliberate, the explanation well might be that in subsection (h)(2) (see note 7) the rights of the United States were expressly in no way affected as against any *third party* causing or contributing to the discharge. We are unable to find any Congressional intent in subsection (g) that no in rem remedy should be allowed as against a third-party non-discharging vessel that caused or contributed to the discharge.

*As to (b),* the decision of the issue under the present facts is clear. The sole fault of the accident causing the oil spill was the *negligence* of the BIG SAM. Under the Act, the United States may be responsible for removing the substance from the navigable waters unless it is determined that

11. The regulation was changed in 1978 to allow only operators to apply for such a certificate. At the time of the collision 46 C.F.R. § 542.4 allowed either the operator *or* the owner to apply for such certificate. The only complaints dealt with by the Federal Maritime Commission when the regulation was amended in 1978 had to do with the hampering of (1) "spot" or "trip" chartering and (2) the ability to contract for pollution liability if the owner could not apply for the certificate. The Commission found both arguments without merit. The ability to actually insure the vessel does not appear to have been affected by the regulation. *See* 43 Fed.Reg. 35704, 35706 (August 11, 1978).

12. The government has not urged this issue of the owner's personal liability upon this appeal,

although it disagrees with the district court's ruling. The government is thus unable to obtain relief by personal judgment against the owner on remand.

We reach the issue, however, because a construction of subsection (g) as a whole is of assistance in determining the remaining issues raised by this appeal.

13. *See* Conference Rept. No. 91–940, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Ad.News 2691, 2724, where the committee stated: "The inclusion of specific language relating to the maritime lien and actions against the owner or operator are for the purposes of clarification only."

the removal will be done properly by the discharger. 33 U.S.C. § 1321(c), (d). As stated in this context, "[n]egligent conduct causing loss to others constitutes a traditional maritime tort." *Matter of Oswego Barge Corp.*, 664 F.2d 327, 334 (2d Cir. 1981). "[T]he federal courts have held that oil pollution is a tort under general maritime law." Comment, Federal Water Pollution Control Act, 53 Tul.L.Rev. 1421, 1422 (1979). "Oil pollution in navigable waters has been deemed a tort for which the United States is entitled damages." *United States v. City of Redwood City*, 640 F.2d 963, 969–70 (9th Cir. 1981). *See also Commonwealth of Puerto Rico v. SS Zoe Colocotroni*, 628 F.2d 652, 672 (1st Cir. 1980).

Thus, even if subsection (g) of the Act provides an exclusive remedy (which below we hold it does *not*), the damages caused to the United States (its cleanup costs)—even if (as we below reject) subject to the liability limits of the Act—result from a maritime tort, at least when caused by the negligence of a non-discharging vessel on the navigable waters.

A maritime lien, necessary as a prerequisite for the in rem action, Gilmore & Black, *The Law of Admiralty*, § 1–12 at 35, § 9–19 at 622 (2 ed. 1975), may arise out of a tort claim against a vessel, *id.*, § 9–2, at 587–89. 2 *Benedict, Admiralty*, § 11 at 1–58—1–59 (7th ed. 1981). Suit may be brought against the vessel in rem in the proceeding to enforce the lien. Gilmore & Black, *supra*, § 9–3 at 589–90. Tort liens may arise against a vessel even when it is under the control of persons neither the owner nor the owner's agents, including that of a bareboat charterer. *The Barnstable*, 181 U.S. 464, 21 S.Ct. 684, 45 L.Ed. 954 (1901); *The China v. Walsh*, 74 U.S. (7 Wall.) 53, 19 L.Ed. 67, 73 (1868); *see also, Baker v. Raymond Intern., Inc.*, 656 F.2d 173, 183–84 (5th Cir. 1981); *Grigsby v. Coastal Marine Service, Inc.*, 412 F.2d 1011, 1030–31 (5th Cir. 1969), *cert. dismissed*, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970).

Thus, the statutory no-fault remedy of limited liability provided by subsection (g) is here grounded also upon the sole negligence of the non-discharging third-party vessel. We see no reason why, at least as to a negligent third-party non-discharging vessel, the United States may not exercise an in rem remedy under the general maritime law to recover oil-pollution cleanup costs incurred as a result of conduct that constitutes a maritime tort, even though subsection (g) might limit the recovery whether or not the sole-cause act or omission was tortious under the present facts. We need not here decide whether the United States likewise has an in rem remedy when the sole-cause act or omission did not constitute negligence.

*Subsection (g): Exclusive Remedy for Government's Recovery of Oil-Spill Cleanup Costs against Negligent Third-Party Non-Discharging Vessel?*

Subsection (f) relates to oil-spill liability of discharging vessels or facilities, and subsection (g) relates to such liability for third parties whose act or omission is the sole cause of the discharge. In virtually identical terms (see notes 5 and 6), these subsections provide for (a) a strict (no fault) liability up to stated limits (excusable only by the intervening sole cause of a limited specified nature) and (b) full liability for all such costs if the discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the discharger or third party. By reference to the legislative history, the government persuasively argues that the specification of these two new remedies was not intended to exclude other remedies available for the recovery of damages (costs of cleanup) caused by oil-spill, such as for those through simple negligence (a maritime tort) of a vessel without the owner's privity or knowledge, where the owner's liability is limited to the value of the vessel and its freight, see 46 U.S.C. § 183(a).

With regard to subsection (f), relating the liability of a discharging vessel, this argument has been rejected by this and other courts. The appellee vessel and owner strongly argue that similar reasoning requires a similar interpretation of the identi-

cal language of subsection (g), relating to the liability of a non-discharging sole-cause third-party vessel. For reasons to be explained, we find that as to *third-parties* any Congressional intent to provide subsection (g) as an exclusive remedy for the United States is negatived by the express provision of subsection (h)(2) that the liabilities provided by § 1321 "shall in no way affect any rights which . . . the United States Government may have against any third party."

Preliminarily, we note the rationale of the decisions that held that subsection (f) was *implicitly* intended to provide the exclusive remedy against discharging vessels for the government's recovery of its oil-spill cleanup costs. As summarized by this court in *United States v. Dixie Carriers, Inc.*, 627 F.2d 736, 739 (5th Cir. 1980):

> Although the express language of the statute provides little guidance to indicate Congress' intent, the structure of the remedies in section 1321(f)(1) suggests that Congress intended for those statutory remedies to be exclusive. The statute allows the government to recover only a limited amount of its cleanup costs under a strict liability theory. The government can then obtain additional, unlimited recovery of its cleanup costs only if it can prove willful negligence or willful misconduct with regard to the discharge.
>
> Congress' intent to achieve a balanced and comprehensive remedial scheme in section 1321(f)(1) by matching limited recovery with strict liability and unlimited recovery with proof of willful conduct is apparent from the legislative history. The original Senate bill allowed the government an unlimited recovery upon proof of simple negligence. S.Rep.No.91–351, 91st Cong., 1st Sess. (1969). The House of Representatives bill limited the government's recovery even upon proof of a willful discharge. H.R.Rep.No.91–127, 91st Cong., 1st Sess. (1969), *reprinted in* [1970] U.S.Code Cong. & Admin.News, p. 2691. The final statute allowing only limited recovery under a strict liability theory and allowing an unlimited recovery only upon proof of willful conduct represents a compromise between the two

proposed statutes. *See* H.R.Conf.Rep.No. 91–940, 91st Cong., 1st Sess. 30–39 (1969), *reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 2712–28.

> In enacting a compromise bill that limits the government's recovery for cleanup costs in all cases except those involving willful discharges, Congress apparently intended to deter oil spills and recover cleanup costs in a manner that would protect most vessel owners from potentially crushing liability.

A similar conclusion has been reached by the Second and Fourth Circuits. *In re Oswego Barge Corp.*, 664 F.2d 327, 344 (2d Cir. 1981); *Steuart Transportation Co. v. Allied Towing Corp.*, 596 F.2d 609, 614–18 (4th Cir. 1979). *See also*: Comment, Federal Water Pollution Control Act, 53 Tul.L. Rev. 1421 (1979); *contra*, Note, Oil Spills and Cleanup Bills: Federal Recovery of Oil Spill Cleanup Costs, 93 Harv.L.Rev. 1761 (1980).

However, at this point we must note that a facet of the reasoning was that the Act itself did not show any intent to permit other remedies against the *discharger* than those stated by subsection (f). In *Dixie Carriers, supra*, we expressly noted, with regard to other remedies against third parties,

> Section 1321(h)(2) states that the FWPCA [the Act] does not affect the rights which the United States may have against a third party whose actions caused an oil spill. *See United States v. LeBeouf Brothers Towing Co.*, 621 F.2d 787 (5th Cir. 1980) (third party defense under section 1321(f)(1) for oil spill from barge does not extend to tug towing barge at time of spill). No such express language allows the government to recover its cleanup costs under the Refuse Act or common law.

627 F.2d at 742. *See also Oswego Barge, supra*, 664 F.2d 327 at 341 n.19.

In holding that the Act provides an exclusive remedy as against the *discharger, Oswego Barge* contained a thoughtful and well-reasoned discussion of the criteria for

gauging whether the Act had preempted (as against the *discharger*) other causes of action there asserted, which included both the maritime tort (simple negligence) and the Refuse Act actions, both here presently asserted by the United States against the present *third party non*-discharging vessel. See especially 664 F.2d at 335–39. We see no need to reiterate the detailed reasoning of that opinion, but we here note and adopt the salient features of that decision's excellent analysis of the applicable criteria as to whether the Act [referred to as the "FWPCA" in that opinion] had preempted other statutory or judge-made maritime law remedies.

With respect to non-maritime federal common law, the Court has recently articulated a strict test for determining the preemptive effect of a federal statute. *City of Milwaukee v. Illinois*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981). Instead of inquiring whether "Congress ha[s] affirmatively proscribed the use of federal common law," *id.* 101 S.Ct. at 1791, we are to conclude that federal common law has been preempted as to every question to which the legislative scheme "spoke directly," and every problem that Congress has "addressed." *Ibid.*

664 F.2d at 335.

The Supreme Court has recognized, however, that the federal judiciary has a more expansive role to play in the development of maritime law than in the development of non-maritime federal common law. [Citations omitted.]

664 F.2d at 335–36.

In recognizing a substantial law-creating function for federal courts in maritime law, the Supreme Court appears to have applied the presumption of statutory preemption somewhat less forcefully to judge-made maritime law than to non-maritime federal common law. [Citations and discussion omitted.]

664 F.2d at 336.

Ultimately determining whether non-statutory maritime law, as to both liabilities and remedies, survives enactment of a statute requires a careful analysis of several factors that the Supreme Court has considered relevant in assessing whether the presumption of preemption has been overcome. *Any terms of the statute explicitly preserving or preempting judge-made law are of course controlling, as is clear evidence of Congressional intent to achieve such results.* In the absence of clearly expressed legislative intent, legislative history may provide useful guidance. (Emphasis supplied.)

664 F.2d at 338–39.

Applying these criteria, we will for reasons stated below find that subsection (g) of the Act did *not* preempt or exclude a remedy in simple-negligence maritime tort, subject to statutory limitation of liabilities, 46 U.S.C. § 183(a); but that it *did* exclude any potential remedy of the United States under the Refuse Act against the third party *non*-discharging vessel.

*Subsection (h)(2): Express Preservation of Judge-Made Maritime Tort Remedy to Recover Damages Caused by Oil Spill?*

As noted in *Oswego Barge*, "[a]ny terms of the statute explicitly preserving or preempting judge-made law are of course controlling." 664 F.2d at 339. Although no such preservation is evidenced by the statutory language with regard to the liability of *dischargers* to the United States, subsection (h)(2) unequivocally states that "[t]he liabilities established by this section [1321] shall in no way affect any rights which . . . the United States Government may have against any *third party* whose actions may in any way have caused or contributed to the discharge of oil or hazardous substance." The legislative history of this provision, which first appeared in the 1970 predecessor provisions of the Act that establishes the present statutory scheme for recovery of oil-spill cleanup costs, affords no reason not to read this statute according to its unambiguous expression.[14] Thus, as

---

14. 33 U.S.C. § 1321(h) was enacted by the Water and Environmental Quality Improvement Act of 1970, P.L.No.91-224, 84 Stat. 91.

This subsection was subsection 12(1) of Senate Bill 7, which stated that

against third parties causing or contributing to an oil spill, the United States may assert other causes of action than those established by subsection (g), or at least any others that are not inconsistent with the remedies thereby provided.

If the BIG SAM's negligence was a concurring instead of sole cause of the accident, no statutory provision of the Act applies to prevent the government's recovery of the non-discharging vessel's apportioned share of the oil-spill cleanup-cost damage occasioned by its contributing negligence. *United States v. City of Redwood City*, 640 F.2d 963, 969–70 (9th Cir. 1981). We can see no functional reason, nor does the legislative history afford any suggestion of such a purpose, that the government's remedy against the negligent third party vessel should be less because that negligence was the sole instead of merely a contributing cause of the accident.

The government here asserts two causes of action beyond those provided by subsection (g): (1) a maritime tort action, based upon the negligence of the BIG SAM, and (2) an alleged implied action for violation of the Refuse Act. We now turn to these two causes of action alleged:

■ (1) *Maritime Tort*: As we previously noted, under traditional maritime principles, negligent conduct on the navigable waters that causes loss to another constitutes a maritime tort. *See, e.g., Oswego*

*Barge, supra,* 664 F.2d at 334, 343–44. "Oil pollution in navigable waters has been deemed a tort for which the United States is entitled damages." *United States v. City of Redwood City*, 640 F.2d 963, 969–70 (9th Cir. 1981). Even prior to the enactment of the 1970 predecessor of the present Act, at least one federal district court had recognized a cause of action in maritime tort in favor of a state government for damages caused by an oil discharge into the state territorial waters. *State of California, etc. v. S.S. Bournemouth,* 307 F.Supp. 922, 926–28 (C.C.Cal.1969). We have little doubt that, even prior to the 1970 enactment, had the United States brought an action to recover damages by way of cleanup costs, recovery would have been allowable under maritime law for a maritime tort. *See* Comment, *supra,* 53 Tul.L.Rev. at 1422–23; Note, *supra,* 93 Harv.L.Rev. at 1770–72.

■ Before us, the government only raises the issue of whether, by virtue of subsection (h)(2)'s express preservation, it is permitted to assert its cause of action in maritime tort against the BIG SAM and its owner, to recover damages to the government (the oil-spill cleanup costs) caused solely by the BIG SAM's negligence, under circumstances where the conduct occurred without the privity or knowledge of the owner—so that the owner is entitled to the limitation of personal liability provided by 46 U.S.C. § 183(a) of no more than the value of the vessel and its freight.[15] We

---

(1) The liability established by this section shall in no way affect any rights which (1) the owner or operator of a vessel, an onshore or offshore facility, or an onshore or offshore drilling-production facility may have against any third party whose acts may in any way have caused or contributed to such discharge, or (2) the United States Government may have against any third party whose actions may in any way have caused or contributed to the discharge of oil.
115 Cong.Rec. 28949 (1969). The conference substitute retained this provision in section 11(h). Conference Rept. No. 91–940, *supra,* note 15. [1970]. U.S.Code Cong. & Ad.News at 2726.

The Federal Water Pollution Control Act Amendments of 1972, P.L.No.92–500, 86 Stat. 816, retained unchanged subsection (h), but with the addition of the final phrase, "or haz-

ardous substance." *See reprinted in* [1972] U.S.Code Cong. & Ad.News 951, 1014.

**15.** From a reading of the House debates on the Conference Report No. 91–940, on H.R. 4148 (which ultimately became the 1970 Act), it is apparent that Congress was aware of additional remedies that might be subject to the limitations of 46 U.S.C. § 183(a). For instance, Congressman Cramer, a leading manager of the legislation, stated that

it should be borne in mind that this limitation of liability is solely for cleanup costs by the United States and does not propose to limit liability that might be imposed by State law or that exists under common law . . . .

If there are charges that another government would wish to make, say in the case of a spill that involved both the United States and Canada, or if there are charges or damages due to third parties under admiralty law

have little hesitation in declaring that such a remedy is not inconsistent with the remedy provided by subsection (g). *See United States v. City of Redwood City*, 640 F.2d 963, 970 (9th Cir. 1981). The allowance of the remedy thereby permitted does not thwart any Congressional purpose of the Act to protect vessel owners from potentially crushing liability and from an uninsurable risk, since the vessel is so liable and insurable to those limits against recovery of damages caused by maritime torts, whether the present one or others.

We expressly do not reach two issues, unnecessary for us to decide under present facts: (1) whether a maritime tort not subject to the limitation of liability because of the owner's knowledge or privity would be inconsistent with the remedy provided by the Act for willful conduct or willful negligence; and (2) whether the maritime tort remedy provides a recovery that is cumulative to or concurrent with the remedy provided by subsection (g).[16]

■ (2) *The Refuse Act*: Section 13 of the Rivers and Harbors Act, 33 U.S.C. § 407 (commonly referred to as the "Refuse Act") prohibits the discharge of "refuse matter" (which has judicially been interpreted to include oil) from any vessel into the navigable waters of the United States. The United States argues that a civil remedy action is implied by that statute, and it seeks recovery on that basis also.

With regard to the remedy against the discharger, the courts have consistently held that any Refuse Act remedy for cleanup damages is inconsistent with the remedy against the discharger provided by the subsection (f) and is therefore preempted by that latter statute. *Oswego Barge, supra*, 664 F.2d at 343; *Dixie Carriers, supra*, 627 F.2d at 740. The essential reasoning is that any such strict liability remedy held to be implied by the Refuse Act, would provide recovery of damages without limitation, while subsection (f) in providing strict (no fault) liability provides for specified limits.[17]

For identical reasons, we affirm the district court's conclusion that subsection (g), providing for strict liability in limited amount against a faultless third-party causing the accident, is inconsistent with the no-limitation strict liability remedy to be implied from the Refuse Act.

*Conclusion*

Accordingly, we AFFIRM the district court's dismissal of the United States claim insofar as based upon the Refuse Act; but we REVERSE the dismissal of the government's maritime tort claim and the district court's disallowance of an in rem remedy for the subsection (g) cleanup-cost damages resulting from the BIG SAM's negligence. The case is remanded for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART, AND REMANDED.

---

or common law, these would be in addition and would not be subject to our limitation of liability.
116 Cong.Rec. 9326–27 (1970) (remarks by Rep. Cramer).

16. If cumulative, the government might recover both the subsection (g) limits and the limitation-of-liability limits, where its actual cost exceeded the highest of the two. If concurrent, the United States would recover only the higher of the two limits. Here, however, the record indicates that the value of the vessel is substantially greater than the $300,000 cleanup-cost damages sustained by the government.

17. *See Oswego Barge, supra*, 664 F.2d at 343:
 To whatever extent judge-made remedies for violation of the Refuse Act include recovery for cleanup costs based on strict liability, such remedies would be plainly inconsistent

with the FWPCA, because the strict liability remedy of the FWPCA is subject to dollar limitations, while recovery of damages under the Rivers and Harbors Act of 1899, when permitted at all, is not subject to the limits of the Limitation Act, *University of Texas Medical Branch v. United States*, 557 F.2d 438 (5th Cir. 1977), *cert. denied*, 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978); *In re Chinese Maritime Trust, Ltd.*, 478 F.2d 1357 (2d Cir. 1973), *cert. denied*, 414 U.S. 1143, 94 S.Ct. 894, 39 L.Ed.2d 98 (1974). Allowing the Government a judge-made damage remedy without limits in strict liability under the Refuse Act would amount to "rewriting rules that Congress has affirmatively and specifically enacted." *Mobil Oil Corp., supra*. [436 U.S. 618 at 625, 98 S.Ct. 2010 at 2015, 56 L.Ed.2d 581 (1978).]