**UNITED STATES of America, Plaintiff-Appellant,**

v.

**M/V BIG SAM, in rem, et al., Defendants-Appellees.**

No. 81–3127.

United States Court of Appeals, Fifth Circuit.

Dec. 13, 1982.

Wendy M. Keats, Leonard Schaitman, Thomas W. Snook, Allen Van Emmerik, Dept. of Justice, Civ. Div., Washington, D.C., for plaintiff-appellant.

Normand F. Pizza, New Orleans, La., for M/V Big Sam and Zito Towing Co.

Leonard N. Bouzon, Thomas J. Wagner, Richard A. Sabalot, New Orleans, La., for Mission Ins. Co.

Machale A. Miller, New Orleans, La., for amicus Water Quality.

## ON PETITIONS FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC

(Opinion July 30, 1982, 5 Cir., 1982 681 F.2d 432)

Before WISDOM, RANDALL and TATE, Circuit Judges.

PER CURIAM:

The principal issues of this appeal relate to the proper statutory construction of section 311(g), (h), Federal Water Pollution Control Act, 33 U.S.C. § 1321(g), (h). *See* panel opinion at 681 F.2d 432. The focus of the defendant parties' applications for rehearing is the alleged inconsistency of the panel's interpretation of these subsections (g) and (h), with prior interpretations of subsection (f), section 311(f), 33 U.S.C. § 1321(f). The panel adheres to its construction of subsections (g) and (h), as based on the unambiguous statutory language that presumably reflects the unambiguous Congressional intent—especially since the legislative history gives no reason to doubt that the legislative words mean precisely what they say. Even assuming that the alleged inconsistency between subsections (f) and (g) is illogical,[1] it is for Congress to correct the syllogism, not the courts.

### I.

Subsections (f), (g), and (h) relate to liability for the costs of removing pollution of navigable waters of the United States caused by the discharge of oil or hazardous substances. Subsection (f) provides that the *discharger* will be liable without fault

1. The panel does not, however, concede that this inconsistency is irrational or beyond the Congressional purview in the enactment of this complicated legislation compromising conflicting interests. *See, e.g.,* note 8 *infra.*

but only up to a limited amount specified by statute,[2] except where the discharger can prove that the sole cause of the discharge was, *inter alia,* "an act or omission of *a third party* without regard to whether any such act or omission was or was not negligent." Subsection (g) similarly provides for strict (no fault) liability in limited amount for such sole-cause third party, with similar exceptions. Subsection (h) provides, however, that the liabilities established by the Act "shall *in no way* affect *any* rights" that the United States or other persons "may have against any third party whose acts may in any way have caused or contributed to such discharge."

The uncontroverted facts before the court show: The defendant vessel, BIG SAM, collided with a tank barge and caused an oil spill to be discharged from the latter. The sole cause of the collision was the negligence of BIG SAM, the non-discharging third-party vessel. BIG SAM and its owners contended that their exclusive liability for the cleanup costs was provided by the sole-cause strict liability provisions of subsection (g), under which (based on BIG SAM's 155 gross tons) liability was limited to $15,500. The panel held, however, that BIG SAM—undoubtedly liable as the "sole cause" third party, irrespective of negligence, under subsection (g)—was subject to liability for the damages[3] caused by *its negligence* and thus that subsection (g) "sole [no fault] *cause*" liability was not exclusive and did not relieve BIG SAM and its owners of their liability[4] under ordinary maritime tort principles. The panel so concluded, because of the unambiguous provision of subsection (h)(2) that the liabilities established by the Act

> shall *in no way affect* any rights which ... the United States Government may have against any third party whose actions *may in any way have caused OR contributed* to the discharge of oil or hazardous substance. (Emphasis and boldface added.)

That the construction given by the panel to subsection (h) reflects its literal and unambiguous meaning is scarcely questioned by the rehearing applicants or the dissent from denial of an en banc rehearing. Furthermore, the rather scant committee reports concerning the provisions of the Act, as hammered out by a conference committee compromising conflicting approaches and interests, are silent of any reason to believe the words do not mean what they say. Nor has anything in the legislative history or debates called to our attention any concern about relieving nondischarging third parties of their liability under maritime tort principles for their negligence;[5] these sources reflect to the contrary, if anything.

Instead, the panel's construction is attacked as being inconsistent with the judicial construction given almost identical language in subsection (f) concerning the strict liability of *discharger* itself. In *United States v. Dixie Carriers, Inc.,* 627 F.2d 736 (5th Cir.1980), a panel of this court held

---

**2.** However, the discharger will be liable to the full amount of clean up costs where the discharge is "the result of willful negligence or willful misconduct within the privity and knowledge of the owner." Subsection (f).

**3.** Subject, however, to the limitation of liability provided by 46 U.S.C. § 183(a).

**4.** Since the value of the vessel was greater than the $300,000 cleanup costs demanded, the panel did not reach the issue of whether the maritime tort and the subsection (g) strict liabilities against the third party are concurrent (so that the United States may recover only the greater of the two amounts) or instead cumulative. 681 F.2d at 444 and n. 16.

**5.** The concerns at which attention were primarily directed in these sources were to the liabilities of *dischargers,* subject to crushing potential liability against which insurance could not be procured because of the day-to-day exposure to risk of discharge in the transportation of oil and other hazardous substances. These concerns did not necessarily implicate any inability of vessels not engaged in such trade to secure insurance for tort damages resulting *from collision with another vessel,* whether or not it carried oil; or with crushing personal liability of the tort-causing vessel's owner in excess of the insurance limits, for these owners were already protected from such excessive exposure by the limitation of liability act, 46 U.S.C. § 183(a).

that, with regard to a discharger—admitting that "the express language of the statute provides little guidance to indicate Congress' intent," 627 F.2d at 739—subsection (f) provided the exclusive remedy for the government to recover cleanup costs, and that a remedy against the discharger for ordinary negligence in maritime tort seems to have been excluded "by a balanced and comprehensive remedial scheme in section 1321(f)(1) by matching limited recovery with strict liability and unlimited recovery with proof of willful conduct." *Id.* In support of this ultimate conclusion, however, *Dixie Carriers* pointed out instances in the Act where other specific remedies were allowed—including that the Act "does not affect rights which the United States may have against a *third party* whose actions caused an oil spill," citing subsection (h), 627 F.2d at 742—and pointed out that, as against a discharger, "[n]o such express language allows the government to recover its cleanup costs under the . . . common law." [6] 627 F.2d at 742. Thus, in *Dixie Carriers* we in part relied upon subsection (h)'s provision, expressly preserving maritime tort remedies as against third parties (without an equivalent preservation against dischargers), as supporting the construction that such maritime tort remedies were *not* preserved but were instead supplanted as against *dischargers* themselves by the strict-liability remedy of subsection (f).

The panel thus perceives no inconsistency in the respective constructions given by it

to subsections (g) and (h) and by *Dixie Carriers* to subsection (f), given the different and additional statutory provision expressly applicable to third parties alone by subsection (h) and expressly relied upon both by this panel and by *Dixie Carriers* in explaining their respective constructions of subsections (f) and (g).

## II.

The complaint as to the panel's construction of subsections (g) and (h) is thus not directed to any error in construing or overlooking unambiguous language of the statute, nor is it in truth directed at any inconsistency between our holding and that in *Dixie Carriers.*

The complaint, rather, is that Congress was inconsistent in providing an exclusive strict liability remedy against dischargers by subsection (f) (if correctly construed by *Dixie Carriers,* which admitted the ambiguity of the statute in that regard [7]), but in permitting against negligent third parties a maritime tort remedy as well (whether concurrent or cumulative, *see* note 4 *supra*). We who are not Congressmen might think it is illogical to permit the Act's strict liability remedy to supplant maritime tort remedies against a negligent discharger who created the bulk of the risk, but not against a negligent non-discharging third person who causes a discharge.[8]

However inconsistent we may think this disparate treatment, however much we

6. Earlier in its discussion, the court had referred to the remedy sought as being under "common law maritime tort" theory. 627 F.2d at 741.

7. The government, conceding the panel decision to be correct, asked for rehearing en banc in order to overrule *Dixie Carriers,* as affording a construction of subsection (f) that was inconsistent with the present panel's of subsection (g). At least the members of the panel felt that it would be inappropriate to reconsider *Dixie Carriers* where no litigation against a discharger was at actual issue and that, besides, Congress may well have intended to treat discharger and third party differently in that regard, as indicated by *Dixie Carriers. See* note 8 *infra.*

8. However, if we were members of Congress concerned with economic reality as well as logic, and if we had had the benefit of the

extensive hearings as to the problems of insuring against oil-pollution damage, we may have concluded that third parties needed no such exclusive-liability feature to obtain adequate insurance protection, as compared with those in the category of dischargers, who are exposed daily (rather than exceptionally) to the risk of causing oil-pollution damage, *see* note 5 *supra.*

*Dixie Carriers* quotes a leading Congressional exponent of the conference compromise ultimately enacted as stating, 627 F.2d 739–40:
limitations of liability and imposition of liability should not be such as to preclude the possibility of recovery of cleanup costs from the *discharger.* We felt that the gauge of this liability should be whether or not insurance could be obtained to cover these events. Consequently, the House bill provided for limitations of liability for vessels based upon an evaluation of the world insurance market

may be of the view that we could tidy up the statute and make of it what to us seems to be more sense, it is simply not part of our function as judges to re-write, in the guise of statutory construction, unambiguous statutory language in order to cure what to us seems to be statutory deficiencies. Last Term, the Supreme Court so admonished on at least two occasions.

In *American Tobacco Company v. Patterson,* 456 U.S. 63, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982), reversing a circuit court's interpretation of unambiguous statutory language to different effect, the Court noted that while "[s]tatutes should be interpreted to avoid untenable distinctions and unreasonable results where possible," 456 U.S. at 71, 102 S.Ct. at 1538,

> [a]s in all cases involving statutory construction, "our starting point must be the language employed by Congress," *Reiter v. Sonotone Corp.,* 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979), and we assume "that the legislative purpose is expressed by the ordinary meaning of the words used." *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). Thus "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2055, 64 L.Ed.2d 766 (1980).[9]

456 U.S. at 68, 102 S.Ct. at 1537.

Again, in *Griffin v. Oceanic Contractors, Inc.,* —— U.S. ——, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982), the Supreme Court reversed this circuit and its line of decisions that had "sensibly" construed a statute provision contrary to its unambiguous expression, and the Court explicitly enjoined against creative judicial interpretation of an unambiguous statute in order to accord with its supposed purpose (despite absence of any legislative history indicating any intention other than that expressed by the unambiguous wording):

> "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *United States v. American Trucking Assns., Inc.,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). See *Caminetti v. United States,* 242 U.S. 470, 490, 37 S.Ct. 192, 196, 61 L.Ed. 442 (1917). Nevertheless, in rare cases the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling. We have reserved "some 'scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning . . . would thwart the obvious purpose of the statute.'" *Commissioner v. Brown,* 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965) (quoting *Helvering v. Hammel,* 311 U.S. 504, 510–11, 61 S.Ct. 368, 371, 85 L.Ed. 303 (1941)). This, however, is not the exceptional case.

—— U.S. at ——, 102 S.Ct. at 3250.

It is true that interpretations of a statute which would produce absurd results

---

> for this new type of risk. (Emphasis supplied.)

If this was the basis upon which Congress decided to treat differently the liability of dischargers and of non-discharging third parties, it would be difficult for judges to determine that this classification was irrational or unreasonable so as somehow to ignore or to re-write unambiguous language that provided the oil-pollution liability of negligent non-discharging third persons to be different from that Congressionally provided for negligent dischargers.

**9.** Considering that the present unambiguous subsection (h) was involved in a text hammered out in conference committee as a compromise of conflicting interests and approaches, we also find particularly appropriate the Court's further remarks, 456 U.S. at 68, 102 S.Ct. at 1537:

> The plain language of § 703(h) is particularly cogent in light of the circumstances of its drafting. It was part of the Dirksen-Mansfield compromise bill which represented "not merely weeks, but months of labor." 110 Cong.Rec. 11935 (1964) (remarks of Sen. Dirksen). As Senator Dirksen explained, "I doubt very much whether in my whole legislative lifetime any measure has received so much meticulous attention. We have tried to be mindful of every word, of every comma, and of the shading of every phrase."

are to be avoided if alternative interpretations consistent with the legislative purpose are available. See *United States v. American Trucking Assns., Inc.*, 310 U.S. 534, 542–543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940); *Haggar v. Helvering*, 308 U.S. 389, 394, 60 S.Ct. 337, 339, 84 L.Ed. 340 (1940). In refusing to nullify statutes, however hard or unexpected the particular effect, this Court has said:

> "Laws enacted with good intention, when put to the test, frequently, and to the surprise of the law maker himself, turn out to be mischievous, absurd or otherwise objectionable. But in such case the remedy lies with the law making authority, and not with the courts." *Crooks v. Harrelson*, 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930).

—— U.S. at ——, 102 S.Ct. at 3252.

 In summary, as to the issue now before us, the panel adheres to its view that we should apply unambiguous statutory provisions as written. The statutory compromise of differing interests and approaches may indeed contain inconsistencies and ambiguities in some of its *other* provisions (as typically compromise legislation does within the competence of Congress). Nevertheless, the panel finds these alleged inconsistencies to be no reason to refuse to apply the unambiguous provisions, solely before us, as written, in the complete absence of any legislative history contraindicating the intent unambiguously stated by the particular provision at issue (subsection (h)) as written.

The Petitions for Rehearing are DENIED and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 16) the Suggestion for Rehearing En Banc is also DENIED.

Before CHARLES CLARK, Chief Judge, BROWN, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY and HIGGINBOTHAM, Circuit Judges.

GEE, Circuit Judge, with whom BROWN, RUBIN and JOLLY, Circuit Judges, join, dissenting from the denial of Suggestion for Rehearing En Banc:

With a certain deference, I dissent from the refusal of the court to accord en banc consideration to this appeal. Our refusal to do so leaves standing the panel opinion,[1] one which deranges the apparent plan of the Federal Water Pollution and Control Act (FWPCA) and, taken in combination with our earlier decision in *United States v. Dixie Carriers, Inc.*,[2] produces consequences sufficiently anomalous that I am in serious doubt the Congress could have intended them. As now construed by two panels of our court, operating separately, the FWPCA calls to mind nothing so much as the wag's depiction of a camel: a horse designed by a committee. On this construction, actual dischargers of oil pollutants who are guilty of no more than simple negligence are protected by tonnage limitations on their cleanup liabilities, while third parties whose simple negligence is the cause of such spills are—as maritime tort-feasors—subject to being crushed by full and unlimited liability for the consequences.

I am in no sense certain that the panel opinion's construction, founded as it is on the rock of a literal reading of the statute, is incorrect. It well may be that the strange result produced, having been configured by literal words of the Congress, must be endured by our maritime commerce until the Congress gets around to correcting it. But since neither I nor the panel can make out the faintest rhyme or reason for such an enactment, and since there are plausible arguments against according the act such an irrational construction, I think that these latter should have been addressed by the en banc court, which exists to—and alone can—harmonize panel decisions of our court short of a resort to the over-taxed higher authority.

---

1. Reported at 681 F.2d 432 (5th Cir.1982).

2. 627 F.2d 736 (5th Cir.1980).

*The FWPCA: A Comprehensive Compromise.*

The 1970 amendments to the FWPCA represent Congress' response to the nation's increasing need for imported oil and to the consequent increased risk of environmental damage from oil spills. See *United States v. Bear Marine Services,* 509 F.Supp. 710, 713 (E.D.La.1980).[3] As might have been expected, the final enactment was a compromise. In its original form, the Senate bill would have allowed the government an unlimited cleanup recovery upon proof of mere negligence, while the House proposal would, by contrast, have limited that recovery even in the case of a willful discharge. See *United States v. Dixie Carriers, Inc.,* 627 F.2d 736, 739 (5th Cir.1980). "The final statute allowing only limited recovery under a strict liability theory and allowing an unlimited recovery only upon proof of willful conduct represents a compromise between the two proposed statutes." *Id.* at 739.[4]

*Discharger Liability according to Dixie Carriers.*

The crucial subsections of the statute for our present purposes are 33 U.S.C. Sections 1321(f), (g) and (h). The first two, (f) and (g), are conceptionally and linguistically parallel, as we shall see.

Subsection (f), as pertinent here, provides that a discharger of pollutants is to be held strictly liable for a limited amount of cleanup costs unless he can prove himself into one or more of the four statutory exceptions, and is liable without limit if the government establishes that his discharge was a willful one. The four exceptions comprise discharges caused solely by acts of God or of war, negligence by the government, and the act (whether or not negligent) of a third party.[5]

Citing the apparent intent of Congress to enact "a compromise bill that limits the government's recovery for cleanup costs in all cases except those involving willful discharges" and so to "deter oil spills and recover cleanup costs in a manner that would protect most vessel owners from potential crushing liability," [6] our earlier panel rejected the contention of the United States that where it could establish simple negligence on the part of a *discharger* the maritime tort action was not preempted by the statutes and a full recovery might be had. Instead, it accepted the discharger's argument that "the language, legislative history, and general statutory scheme of the FWPCA demonstrate Congress' intent to provide an exclusive and comprehensive

---

**3.** Presently on appeal and awaiting final decision in this case.

**4.** We also observed there, in responding to a government contention that it should be permitted to recover unlimited amounts on subsisting maritime tort theories, that "[e]very court that has considered this issue has held that the FWPCA provides the government's exclusive remedy for recovering oil spill cleanup costs," citing numerous authorities, including the district court decision reversed by the panel in the instant case. *Id.* at 738. Thus the reasoning of the panel is in patent conflict with the general view of the statute taken by the *Dixie Carriers* court.

**5.** The apposite language of subsection (f) is:
Except where an owner or operator can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing

clauses, such owner or operator of any vessel from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section shall, notwithstanding any other provision of law, be liable to the United States Government for the actual costs incurred under subsection (c) of this section for the removal of such oil or substance by the United States Government in an amount not to exceed, in the case of an inland oil barge $125 per gross ton of such barge, or $125,000, whichever is greater, and in the case of any other vessel, $150 per gross ton of such vessel (or, for a vessel carrying oil or hazardous substances as cargo, $250,000), whichever is greater, except that where the United States can show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner, such owner or operator shall be liable to the United States Government for the full amount of such costs.

**6.** *Dixie Carriers,* 627 F.2d at 739.

remedy for the government to clean up oil spills and to recover cleanup expenses." *Dixie Carriers, supra* at 738. Judge-made theories of maritime tort were, in the view of the *Dixie Carriers* court, swept away by the FWPCA insofar as they intruded upon the Congress' comprehensive scheme of limited absolute liability for negligent carrier-dischargers. With the instant panel decision, however, we learn that the congressional scheme was not comprehensive after all, since those same carriers (or others), should they find themselves the sole cause of *another's* oil spill, remain subject to unlimited liability in maritime tort. And thus our committee construction of the FWPCA: limited liability if one negligently dumps his own oil; unlimited liability if one negligently causes another to dump his. A crazy-quilt indeed, one by which Mr. Bumble would have been pleased.

*Third-Party Liability, according to Big Sam.*

Subsection (g) governs the liability of third parties who solely cause oil spills. Taking up on subsection (f)'s third-party exception to discharger liability, that section provides the identical liability for such a third-party sole-causer to that of a discharger. Unless such a third-party causer can prove himself into the same exceptions to liability granted in subsection (f) to the discharger, his liability is substituted for that of the discharger.[7]

The instant panel has concluded that this is not so, that those whose simple negligence causes discharges by others are to be exposed to "potentially crushing liability," *supra,* are meant by the Congress to incur it, rather than or in addition to the limited liability scheduled. Thus he who, carrying oil, solely and carelessly causes another to discharge it, is to be—in appropriate circumstances—crushed, while he who carried it and carelessly discharged it is to be shielded. Nor is this anomalous treatment limited to third parties who have engaged in oil carriage and reaped the benefit of the rates charged for such commerce; any third party will do as a sacrifice. It seems to me arguable that the Congress did not and could not have intended such an exercise in statutory Russian Roulette.

*The Maritime Tort Exception.*

Subsection (h) preserves all rights that the government "may have against any *third party* whose actions may have in any way caused or contributed to the discharge . . . ." (Emphasis supplied.)

The panel has held that by reason of the above, and despite Section (g), the government may recover without limit against a third-party sole-causer. Thus, we decree, he may be crushed, while an equal-fault discharger is to be shielded. By default, the court en banc agrees. From that de-

---

**7.** The apposite language of Subsection (g) is:

In any case where an owner or operator of a vessel, of an onshore facility, or of an offshore facility, from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section, proves that such discharge of oil or hazardous substance was caused solely by an act or omission of a third party, or was caused solely by such an act or omission in combination with an act of God, an act of war, or negligence on the part of the United States Government, such third party shall, notwithstanding any other provision of law, be liable to the United States Government for the actual costs incurred under subsection (c) of this section for removal of such oil or substance by the United States Government, except where such third party can prove that such discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of another party without regard to whether such act or omission was or was not negligent, or any combination of the foregoing clauses. If such third party was the owner or operator of a vessel which caused the discharge of oil or a hazardous substance in violation of subsection (b)(3) of this section, the liability of such third party under this subsection shall not exceed, in the case of an inland oil barge $125 per gross ton of such barge, or $125,000, whichever is greater, and in the case of any other vessel, $150 per gross ton of such vessel (or, for a vessel carrying oil or hazardous substances as cargo, $250,000), whichever is greater. In any other case the liability of such third party shall not exceed the limitation which would have been applicable to the owner or operator of the vessel or the onshore or offshore facility from which the discharge actually occurred if such owner or operator were liable.

fault, I respectfully dissent: that Congress has said so in terms is persuasively arguable, perhaps plain; that its intent was to say so is, in my view, dubious—sufficiently so that I am satisfied our court has slighted its en banc function by refusing to face and resolve a fundamental conflict in principle between its panels, to adopt the approach of the *Big Sam* panel and limit or disapprove the reasoning of *Dixie Carriers,* or to consider the countervailing arguments for a construction of the Act consonant with our prior panel decision in *Dixie Carriers.* Among these are:

1. As noted above, our earlier *Dixie Carriers* opinion concluded that, since subsection (f)'s liability limitations apply in cases of simple negligence, the FWPCA preempts the general maritime tort remedy for such negligence. Though that decision concerned the liability of dischargers, the decision of the *Big Sam* panel that subsection (g)—textually and conceptually identical to and interlocking with subsection (f)—does not preempt the general maritime tort remedy for simple negligence of third-party causers of discharges conflicts in principle with *Dixie Carriers* and throws the general congressional scheme into irrational disarray.

2. By focussing exclusively on the literal language of subsection (h) preserving the government's rights against third-party causers, the panel opinion saps the limitation of liability provided them by subsection (g) of vitality and all but reads it out of the statute.

3. The *Big Sam* panel adopts as to third-party causers the approach of the original Senate bill—unlimited recovery for simple negligence—that was squarely rejected by the Congress. Such an adoption of a rejected approach in the teeth of the legislative history conflicts with the strongest settled principles of statutory construction, both in this court and in the Supreme Court. *See, e.g., Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974).

These do not seem to me to be inconsiderable arguments, especially in view of the curious result to which a single-minded focus on the language of subsection (h) has led our panel in this case. Nevertheless, our court refuses even to consider them en banc.

So doing, it passes to an overburdened Supreme Court the task of relieving those within our jurisdiction from burdens of which it is probable the Congress meant to discharge them, preserves a clear conflict in principle in our decisions, and abdicates what I conceive to be its major function.