**Walter Douglas NUNLEY, et al.,**

v.

**M/V DAUNTLESS COLOCOTRONIS, et al.**

Civ. A. Nos. 77–3886, 78–0214, 78–1040, 78–2306 and 78–2548.

United States District Court, E.D. Louisiana.

June 8, 1987.

W.E. Noel, Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, La., for Nunley.

John N. Cahppuis, Lafayette, La.

John E. Galloway, Galloway, Johnson, Tompkins & Burr, for Tenneco Oil.

Alfred M. Farrell, Hugh Straub, Terriberry, Carroll, Yancey & Farrell, New Orleans, La., for Sea Unity Shipping, S.A.

Brendon Connolly, Dennis Costigan, Mendes & Mount, New York City.

Christopher Kosciuk, Normann & Normann, New Orleans, La.

John B. Gooch, Jr., Montgomery, Barnett, Brown & Read, New Orleans, La., for Point Landing.

William M. Bass, Voorhies & Labbe, Lafayette, La.

Charles Hanemann, Henderson, Hanemann & Morris, Houma, La., for Tenneco Oil.

Alex F. Lankford, Hand, Arendall, Bedsole, Greaves & Johnson, Mobil, Ala., for Dravo Mechling, Inc.

Fred E. Salley, Jack R. Salley, Salley & Associates, New Orleans, La., for Combi Lines.

Debra J. Kossow, Richard Cole, U.S. Dept. of Justice, Admiralty & Shipping Section, Washington, D.C., for U.S.

Robert E. Winn, Sessions, Fishman, Resenson, Snellings & Boisfontaine, New Orleans, La.

Normand F. Pizza, Broadhurst, Brook, Mangham & Hardy, for Zito Fleeting.

J. Walter Ward, Christovich & Kearney, New Orleans, La., for Zito Fleeting, Zito Towing and Highland Ins.

Raymond J. Burke, Burke & Parsons, New York City.

René S. Paysse, Leach, Paysse & Baldwin, New Orleans, La.

### FINDINGS AND CONCLUSIONS

LIVAUDAIS, District Judge.

### I. PROCEDURAL HISTORY:

This action began as five consolidated cases which originated when the M/V DAUNTLESS COLOCOTRONIS (the DAUNTLESS) allegedly struck the sunken Combi Line barge CBLL–01315 (the Combi barge) on July 22, 1977, resulting in constructive total loss of the former vessel. The Combi barge had been one of over one hundred and thirty vessels involved in what is locally known as The Great Barge Breakaway, a major breakaway of barges at locations along the east and west banks of the Mississippi River on January 16, 1974. Unlike the majority of barges involved in that incident, the Combi barge was not recovered; it had sunk at mile point 88.4 above the Head of Passes (AHP), approximately 200 feet off the left descending bank of the river.

The Great Barge Breakaway itself spawned litigation which was settled in October 1979, without any finding or admission of guilt on the part of any of the parties.

The present litigation originally involved a motley cast of characters. Captain Walter Nunley filed *in rem* claims for salvage against the DAUNTLESS and Tenneco Oil Company's cargo, which was on board. Combi Line, a joint service engaged in by Hapag-Lloyd, A.G. and Holland American Lines Freight B.V., now International Transport, B.V. (Combi), filed for limitation of or exoneration from liability. The owners and operators of the DAUNTLESS, Estrella Leal Navagacion, S.A., Sea Unity Shipping, S.A., and Assuranceforeninger Gard (the DAUNTLESS interests), and Tenneco filed a complaint against the United States and the "upriver defendants"—

Point Landing, Inc., Zito Fleeting, Inc., Zito Towing, Inc., Federal Barge Lines, Inc., Lykes Bros Steamship Co., Dravo Mechling, Inc., and their respective insurers— alleging that the negligent sinking of the Combi barge by the upriver defendants and/or the failure to mark or remove the barge by the United States led to the destruction of the DAUNTLESS and loss of cargo. The DAUNTLESS interests and Tenneco also filed a claim against Combi Lines and its insurer, the United Kingdom Mutual Steam Ship Assurance Association (Bermuda) Limited (the U.K. Club), in the limitation action, alleging that Combi was responsible for the damage to the DAUNTLESS and its cargo due to its negligence in the sinking of the barge and its failure to mark and remove it. The DAUNTLESS interests also sued Tenneco Oil Company as wharfinger under the warranty of safe berth. The United States cross-claimed against Combi for pollution related expenses and for wreck marking and removal expenses. Both Combi Line and the United States brought claims against the upriver defendants for indemnity and/or contribution should judgment be entered against them in favor of the DAUNTLESS.

The upriver defendants then obtained a judgment on the pleadings on the ground that they were not liable for the damage to the DAUNTLESS occasioned by its striking the Combi barge, even if they were negligent in the barge's sinking, because Section 15 of the Rivers and Harbors Act, 33 U.S.C. § 409, places responsibility for marking and raising a sunken vessel on the owner of the vessel, or, when read with § 414, on the United States. Their negligence, if any, could not have been the proximate cause of the wreck, they maintained. *See Nunley v. M/V DAUNTLESS COLOCOTRONIS*, 513 F.Supp. 720, 726 (E.D.La.1981). The Fifth Circuit, sitting en banc, disagreed. It held that the responsibility of either Combi or the United States to mark and remove the vessel could not be regarded, per se, as a superseding cause exonerating the upriver defendants from liability for damages primarily resulting from their negligence. Finding that negligence of the upriver defendants in the 1974

breakaway could have contributed to the later accident, making them liable for their apportioned share of the loss, the Court of Appeals reversed and remanded. *Nunley v. M/V DAUNTLESS COLOCOTRONIS*, 727 F.2d 455, 467 (1984).

As trial of this matter approached, the DAUNTLESS interests and Tenneco Oil Company (as cargo plaintiff) entered into a settlement of the type affirmed in *Leger v. Drilling Well Control, Inc., et al.*, 592 F.2d 1246 (5th Cir.1979) with the United States of America, Tenneco Oil Company (as defendants), and the upriver defendants and their insurers. This settlement resulted in dismissal of the claims by the DAUNTLESS interests and Tenneco against these defendants. The DAUNTLESS interests, Tenneco, the United States of America, and all upriver defendants brought motions to dismiss Combi Line's claims for indemnification and attorney's fees under Fed.R.Civ.P. Rule 12(b)(6). These motions were granted. The United States of America's pollution claim was subrogated to the DAUNTLESS interests. Tenneco as cargo plaintiff assigned its claim to Combi Line. Following this massive flight from the courtroom, the following claims remained to be adjudicated:

(1) DAUNTLESS interests against Combi Line (the U.K. Club) for damages and associated expenses incurred by the DAUNTLESS interests. Included in DAUNTLESS interests' claim was the United States' claim for pollution related expenses.

(2) Combi Line's petition for limitation of or exoneration from liability.

(3) The United States of America's claim against Combi Line for wreck marking and wreck removal expenses.

(4) Walter D. Nunley's claim against the Tenneco cargo interests and the M/V DAUNTLESS COLOCOTRONIS, *in rem*, for salvage.

(5) Tenneco Cargo's and the M/V DAUNTLESS COLOCOTRONIS' third-party claims against Combi Line for any salvage award.

Jurisdiction lies with this Court under 28 U.S.C. § 1333 and Fed.R.Civ.P. 9(h).

## II. THE ACTION BEFORE THIS COURT:

### A. *The Loss of the CBLL–01315.*

As Chaucer's friar observed, "This is a long preamble of a tale." The following facts were adduced from testimony and exhibits introduced at trial, and the depositions submitted.

■ The testimony of Donald Wood, vice president, in 1974, of Point Landing, Inc., a public fleeting business, and that of Charlton Nettles, Jr. of the U.S. Army Corps of Engineers, established that during the winter of 1973 and 1974, conditions on the Mississippi River were the most precarious that had ever existed. Because of large grain shipments, high water, a longshoremen's strike, and the inaccessibility of upstream ports because of heavy ice on the river, over 3,000 barges were fleeted in the Port of New Orleans. These unusual circumstances set the stage for the Great Barge Breakaway on the night of January 16, 1974. At that time, Combi Line had a fleeting and shifting agreement with Point Landing, Inc., for its LASH barge operations. The LASH fleet, along with a fleet of Lykes Seabee barges, was fleeted at a Point Landing facility on the west bank of the Mississippi River at mile point 101.1 AHP. According to the testimony of Anthony Valence, Jr., the Point Landing dispatcher at that time, the upstream fleet consisted of Lykes Seabee barges. Located immediately downstream was Combi Line's LASH fleet. Although Donald Wood testified that Point Landing had requested that Combi move its barge fleet out of the bend in the river, the evidence supports Combi's contention that Combi Line did not select the location of its fleeting facility. Instead, the facility was chosen by the Port of New Orleans Dock Board. The permit for the fleeting facility was issued to the New Orleans Dock Board, according to the testimony of Charlton Nettles, Jr. and Combi Line representative Bastiaan Boll. (See Estrella Exhibit 152). Moreover, according to Mr. Nettles,

this fleeting facility had been approved by the United States Corps of Engineers, which had the authority to reject its location. It was in this facility that the CBLL–01315 was located on the night of the breakaway, the innermost barge along the bank on the second tier of barges in the fleeting facility. (Estrella Exhibit 2). The barge had been loaded aboard the M/S Bilderdyk in Antwerp, Belgium, with a cargo of steel consigned to Kurt Orban & Company, Inc. (Combi Exhibit 25). The freight on the cargo had been prepaid, and there were no further charges due and owing to Combi Line, according to the testimony of Harry A. Ahner, who was then employed by Biehl & Co., Combi's general agent in New Orleans.

There is nothing to indicate that the location of the LASH barge fleet, and that of the CBLL–01315 itself, was unreasonably dangerous, or that a different location would have prevented the loss of the barge. According to Anthony Valence, Jr.'s testimony, prior to January 16, 1974, no breakaway had ever occurred at the Point Landing LASH/Seabee fleet. The Great Barge Breakaway was unique in its magnitude. It made no distinction between barges located in riverbends and those on the straightaway, or between those moored six across and those moored directly to shore, as the testimony of Charlton Nettles, Jr. illustrates. Although moored directly to the shore in the straightaway, a U.S. Army Corps of Engineers barge was knocked loose.

I find that the barge breakaway in the Port of New Orleans on January 16, 1974 constituted a *vis major*, and that no amount of human skill or precaution could have prevented the CBLL–01315 from breaking away on that morning. No fleet could have been designed to hold fast against this particular breakaway.

The events at the Point Landing facility were described by Anthony Valence, Jr. who was on duty the night of the breakaway. Valence received a telephone call from his boss, Donald Wood, telling him of the breakaway upriver and ordering him to leave the dispatcher's office because there

was nothing that he could do except protect himself. Shortly thereafter, Valence heard the sounds of objects striking the Lykes Seabee fleet directly upstream from the Combi Line fleeting facility. Valence fled the dispatcher's office and took shelter on the other side of the levee where he heard further sounds of numerous and massive collisions coming from the Combi Line fleet. Twenty-one Combi Line barges, it was later discovered, had joined the crowd of unconned vessels moving down the Mississippi River. Among these was the CBLL-01315.

### B. *The Search for the Combi Barge.*

According to Combi Line representative Bastiaan Boll's uncontroverted testimony, Combi made a concerted effort to locate its barges after the breakaway. Walter Lilly, the LASH department manager of Biehl & Co., general agent for Combi at the time, testified that he accompanied the U.S. Coast Guard on a helicopter search; towboats were used to retrieve the barges located. Only one barge remained unrecovered—the CBLL-01315. Gerald Richoux, a tugboat captain who participated in the round-up of barges, testified that he saw, and reported to his dispatcher, what appeared to be a LASH barge going down in the vicinity of the Algiers Lock Forebay on January 16, 1974.

The U.S. Army Corps of Engineers had also received, on January 16, 1974, a report of a barge sinking; this one was on the left descending bank of the river in the vicinity of the Tenneco wharves at mile point 88.4. The Corps conducted a fathometer search on January 17, 1974 and located an object under 46 feet of water. The Corps maintained a river channel of 40 feet for oceangoing vessels, measured by the Carrollton Avenue river gauge. The gauge reading that day was 14.38 feet; the river stage at the Tenneco docks would be one foot less than at Carrollton; therefore, the adjusted channel depth over the object was 33 feet. The Corps therefore requested that the U.S. Coast Guard mark the object with a buoy. According to Captain David K. Carey, U.S.C.G., the Coast Guard did so, twice—on January 16 and January 30, 1974. Both buoys disappeared, and the Coast Guard decided to discontinue marking the wreck on February 24, 1974. The Corps, according to Charlton Nettles, notified all LASH barge owners of the location of the object to give them the opportunity to remove it, for it was considered a hazard to navigation. However, the Corps did not remove the vessel itself or take steps to establish its ownership. By July, 1974, the Corps had lost track of it, and was unable to relocate the sunken barge by fathometer search.

Meanwhile, back in January, Combi Line had decided to hire a magnetometer operator to search for the missing barge. A magnetometer is a device used to locate metallic objects. The average person is not able to use a magnetometer; it must be operated by someone with interpretive abilities in order to be effective, according to the testimony of Elwood Groom, who conducted the search. On January 29, 1974, Elwood Groom and a Combi Line representative conducted a search of the Algiers Lock Forebay area and the area in front of the Tenneco Oil docks, using both a magnetometer and a fathometer. The Combi Line representative informed Groom that they were looking for a LASH barge with a cargo of steel. Although Combi Line designated the area of the search, Groom determined which search patterns would be run. Groom was the only person who examined the magnetometer readings during the search.

The search revealed an object in the vicinity of the Algiers Lock Forebay. The readings of the magnetometer and fathometer indicated that this object had the characteristics of a LASH barge. It was 67 feet below the water's surface at its highest point, resting on the bottom, 80 feet underwater.

After searching the Algiers Lock Forebay, the pair proceeded upstream to the vicinity of the Tenneco Oil dock, where another object was discovered. The magnetometer readings, as interpreted by Elwood Groom, indicated that this object closely resembled a river barge. At this time, weather conditions and the river

stage would not have permitted a diver to search the river and determine the identity of the barges, according to the testimony of Henry Schorr, then chief of the navigation branch of the Corps.

Thus, after searching for its lost barge, Combi had good reason to conclude, on the basis of Elwood Groom's interpretation of his magnetometer readings and fathometer results, along with the reported sighting of a sinking LASH barge in the area of the Algiers Lock Forebay, that the CBLL–01315 was under a minimum of 67 feet of water in the area of the Algiers Lock Forebay, where it posed no hazard to navigation. As Combi Exhibit 11 indicates, Combi considered the barge a total loss. Combi Line made a claim for its loss with its hull insurer and asserted no further acts of ownership in respect to the LASH Barge CBLL–01315, according to the testimony of Bastiaan Boll. The testimony of Charlton Nettles, Jr. established that once the vessel was raised by the United States, the vessel and cargo were sold by the United States and the money received from the sale was paid into the United States Treasury.

For three and one-half years, the CBLL–01315 rested unmarked, its ownership and, after July of 1974, it exact location unknown, in the Mississippi River Channel. The United States Army Corps of Engineers made no effort to mark or to remove the sunken object from the navigable channel until December 17, 1977, months after the M/V DAUNTLESS COLOCOTRONIS, without the assistance of magnetometers or fathometers, had rediscovered its location.

### C. The Wreck of the M/V DAUNTLESS COLOCOTRONIS.

At 9:30 a.m. on July 21, 1977, that unfortunate vessel, the M/V DAUNTLESS CO-LOCOTRONIS, arrived off the Mississippi River's Southwest Pass. There a pilot boarded, and she proceeded upriver. At 12:50 p.m., she changed pilots off Pilottown, and at 7:10 p.m. she anchored at Nine Mile Point Anchorage, mile point 82 AHP. The DAUNTLESS bunkered at Nine Mile Point, receiving about 500 tons of fuel before proceeding to the Tenneco dock to discharge her cargo. Upon completion of bunkering at 1:00 a.m. on July 22, DAUNT-LESS' deep fresh water draft was 38 feet 10 inches forward and 42 feet, 02 inches aft.

There is no indication in the evidence that the DAUNTLESS was not fully equipped and fit, or that her navigation was at fault. According to the deposition testimony of Captain Alvin J. McCarthy, he boarded the DAUNTLESS at 3:30 a.m. on July 22, 1977, to take it from Nine Mile Point to the Tenneco Dock. Captain McCarthy, an experienced compulsory river pilot, had travelled that section of the Mississippi River for 9 years. He testified that, near the Exxon dock, above the Algiers Lock Forebay, the DAUNTLESS took a sheer to port. Although the Captain testified that this would not indicate to him that the vessel had struck something, the DAUNTLESS' Second Assistant Engineer Stavropoulous at the engine room maneuvering platform felt a bump and noted a temporary engine speed reduction at the time of the sheer, as he testified at the United States Coast Guard hearings on the collision. This reduction was also noted by Chief Engineer Andreadakis, who also testified before the Coast Guard.

Testimony of Pierre J. Serio of the Corps of Engineers established that a search using a magnetometer and divers led to the discovery of a LASH barge near the Exxon dock. There was no other obstruction in the area. Once the barge was brought to the surface, Marine Surveyor Derek Wilkinson found its highest corner to be damaged. The DAUNTLESS' bottom showed 340 foot long scoring and holing which, Wilkinson testified, corresponded to the rubbing damage of the Combi barge. The only rational explanation for the sudden development of a hole and 340 foot crease in the DAUNTLESS' bottom is that it had struck the sole protrusion in the area, the sunken Combi barge.

As a direct result of striking the Combi barge, the DAUNTLESS was holed in her No. 5 cargo tank and caused to discharge oil into the river. The discharge of oil from

the DAUNTLESS into the Mississippi River was in violation of various Federal laws, including the Federal Water Pollution Control Act, 33 U.S.C. § 1321. As a result of the collision, the bottom plating and pumping spaces of the DAUNTLESS were fractured. The pump room of the ship flooded with crude oil, a fire ignited in her engine room and fire consumed the engine room and the accommodation spaces located above it. The Coast Guard and the Port of New Orleans began fire fighting efforts which continued through the late afternoon, with the firefighters directing substantial quantities of water into the engine room. At 6:07 p.m., July 22, 1977 the fire was extinguished. At around noon of that day, Chemlink, through its vice-president and general manager, Captain Walter D. Nunley, contracted with the Coast Guard to provide tugs, barges, pumps and manpower to remove water, slops and/or oil from DAUNTLESS' engine room, pumproom, cargo spaces, and other flooded areas, according to Captain Nunley's testimony. It was agreed that tugs would be leased at the rate of $2,000.00 per day, that a barge would be leased at the rate of $500.00 per day, and that none of the equipment would be placed alongside the DAUNTLESS until the equipment was insured and the situation aboard the DAUNTLESS was safe.

The Chemlink-chartered tugs, barge and pumps came alongside the DAUNTLESS on the afternoon of July 22, after the fire was out and after Captain Nunley considered the situation safe. That evening, while aboard the DAUNTLESS, Captain Nunley met with the ship's local agent, George C. ("Tony") Weeks, and agreed on behalf of Chemlink to secure semi-submersible hydraulic pumps from Chemlink's stores in Houston (the Houston pumps) for Chemlink to dewater the DAUNTLESS' engine room, as it had contracted to do.

At about 8 p.m. on July 22, 1977, under the direction of P & I surveyor Captain Jacob ter-Meulen dewatering commenced with Coast Guard equipment, and at 8:15 a.m. on July 23, 1977, the vessel was deemed stable by the Coast Guard's officer-in-charge.

Chemlink had promised that its Houston pumps would be delivered on Saturday, July 23. These pumps, however, were never delivered, and no Chemlink dewatering efforts were attempted from Friday, July 22, through Sunday, July 24.

In the evening of Sunday, July 24, the DAUNTLESS began losing freeboard. Captain ter-Meulen started dewatering of the ship's engine space through her steering gear flat with the aid of two Coast Guard boats and six Coast Guard volunteers. By 3:30 a.m. on Monday, July 25, a gain was observed by use of two 2" portable pumps supplied by the Coast Guard. Between 4:00 a.m. and 5:00 a.m. these pumps were repositioned and connected in line with a Coast Guard cutter's fire pump ejector system, and increased freeboard readings were taken by Captain ter-Meulen throughout the morning.

Meanwhile, on Sunday evening, Tony Weeks called Captain Nunley and asked when the semi-submersible pumps from Houston would arrive. Captain Nunley said that the pumps were unavailable. Weeks, who testified that he was speaking to Nunley as a representative of Chemlink, requested that Nunley get other equipment. Captain Nunley contacted Gulf Pollution, gave them a list of the equipment and labor required, and told them where to obtain it. These pumps did not arrive alongside the DAUNTLESS until approximately 3:30 a.m. on July 25, 1977. At this time, the only dewatering efforts in progress aboard the ship were those conducted by Captain ter-Meulen and the Coast Guard volunteers with the use of Coast Guard equipment. These newly secured pumps from Chemlink were not operational before 10:30 a.m., approximately seven hours after Captain ter-Meulen and the Coast Guard volunteers had stabilized the ship.

According to Captain ter-Meulen, at about 9:15 a.m. on July 25, the Coast Guard volunteers began securing their equipment. They left the DAUNTLESS at 10:15 a.m. after having stabilized the ship and after having determined that it was safe to turn the vessel over to commercial interests.

Thereafter, Chemlink pumps dewatered the ship from Monday, July 25, through the evening of Tuesday, July 26, when pumping efforts were transferred to Murphy Pacific.

Captain Nunley testified that on Friday, Saturday and Monday, he was acting as vice-president and general manager of Chemlink, but on Sunday, he was acting in his personal capacity. The weight of the evidence contradicts this contention.

Throughout Captain Nunley's involvement with the DAUNTLESS, he acted in his official capacity as vice-president and general manager of Chemlink in furtherance of the terms of Chemlink's agreement to provide equipment and manpower to pump water, oil and/or cargo from the ship's engine room, pumproom, cargo tanks, or other flooded areas. His efforts to obtain pumps on July 24 from outside contractors were consistent with his responsibilities as Chemlink's general manager. Moreover, as Chemlink failed to provide the Houston pumps to dewater the DAUNTLESS' engine room, Captain Nunley was obligated to make alternative arrangements to satisfy Chemlink's commitment. Captain Nunley, in his personal capacity, had no written or oral salvage agreement with the DAUNTLESS' owners, operators, agents or representatives engaged on her behalf during the casualty. Chemlink billed the DAUNTLESS interests for its provision of men and equipment to DAUNTLESS at the originally agreed upon rate ($2,000.00 per day for tugs and $500.00 per day for barges), and Chemlink received a total of $140,000.00 for its services.

Dewatering continued from July 27 through August 1, 1977. By August 1, 1977, salvage divers had located and patched the hole in the vessel's hull. On August 2 and August 3, 1977, the oil cargo was discharged from the No. 5 center tank to attending barges to lighten the vessel and to maintain stability. Subsequently, the DAUNTLESS' oil cargo was lightered to Tenneco, with discharge completion on August 27th, 1977. The DAUNTLESS' ad-ventures at sea were over; those in the courtroom were about to begin.

## III. THE CLAIMS:

### A. *The Claim Of The Dauntless Interests Against Combi Line.*

The DAUNTLESS interests brought suit against the barge owner, Combi Line, and the barge P & I underwriter, the U.K. Club, over whom this Court has previously found that it has jurisdiction. The fault alleged is the negligence of Combi in locating its barge fleet in a vulnerable position and in permitting too many barges to be moored across a tier. These actions, according to the plaintiff, resulted in the breakaway of the CBLL–01315 and its sinking. The plaintiff further alleges that Combi was negligent in its search for the barge, and then in failing to mark and remove the barge from the navigable waterway.

Combi Line was not proven to be negligent in the sinking of the CBLL–01315. The weight of the evidence supports a finding that Combi was not unreasonable in parking its barge fleet on the west bank of the river at mile point 101.1 AHP. As was observed above, the fleeting facility was chosen by the Dock Board and approved by the Corps of Engineers; no barge breakaways had occurred there prior to the one in which the Combi barge was lost, and that one occurred as a result of conditions which were unforeseeable and unavoidable—the high river, the port crowded with barges, and the Great Barge Breakaway itself. The United States Supreme Court long ago supplied owners of drifting vessels with the defense of "inevitable accident, or a *vis major*, which human skill and precaution and a proper display of nautical skill could not have prevented". *The Louisiana*, 70 U.S. 164, (3 Wall) 174, 18 L.Ed. 85, 88 (1865); *see also James v. River Parishes Co., Inc.*, 686 F.2d 1129, 1131–32 (5th Cir.1982). The burden of establishing such a defense is a heavy one, but one which the evidence of the unique events of January 16, 1974 recounted at trial fully supports.

■ Nor can the mooring of the Combi barges six across on that particular occasion be considered in any way a proximate cause of the breakaway and sinking of the CBLL–01315. In the first place, the fleet picture (Estrella Exhibit 2) for the night of the breakaway reveals that the lost barge was closest to shore, rather than protruding in the path of the broken-away barges bearing down from upstream. Second, the experience of the U.S. Army Corps of Engineers, whose solitary barge, moored directly to shore, broke out that night, demonstrates that fewer barges in a tier would have offered no protection against the Great Barge Breakaway. To constitute negligence, any fault which resulted in the sinking of the LASH Barge CBLL–01315 cannot be fault in the abstract; it must be a contributory and proximate cause of the sinking. *See Inter-Cities Navigation Corp. v. United States*, 608 F.2d 1079, 1081 (5th Cir.1979); *Board of Commissioners of Port of New Orleans v. M/V FARMSUM*, 574 F.2d 289, 297 (5th Cir.1978). In light of the nature of the breakaway which occurred in the Port of New Orleans on January 16, 1974, I find that Combi Line was not negligent in the sinking or loss of the LASH Barge CBLL–01315.

■ Even though Combi Line was in no way negligent in the breakaway and sinking of its barge, the DAUNTLESS interests maintain that Combi was negligent in failing to mark and remove the barge from the navigable waterway. The potential liability of Combi depends on whether or not it failed in its duty to raise or mark the wrecked barge. 33 U.S.C. § 409, commonly known as the Wreck Act, mandates that, regardless of his fault or lack of fault in causing the sinking, the owner of a sunken vessel has a duty to mark and remove it:

It shall not be lawful to ... voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels ... And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful, and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411 to 416, 418, and 502 of this title.

However, the Fifth Circuit has held that, "if an owner diligently and in good faith searches for his sunken vessel but cannot find it, he has fulfilled his obligations to mark under the Wreck Act." *Nunley v. M/V DAUNTLESS COLOCOTRONIS*, 727 F.2d 455, 459 (5th Cir.1984). Meeting these criteria for search likewise exempts the owner from liability for failure to remove the wreck. *Id.* at 460. Combi Line's search was sufficient to satisfy its Wreck Act obligation. Combi Line searched the surface of the river for its barge and could not find it. It then followed up a reported sinking of a LASH barge with a fathometer and magnetometer search which led to an object under at least 67 feet of water in the Algiers Lock Forebay which had sufficient similarities to the CBLL–01315 to lead the magnetometer operator to identify it, mistakenly, as the LASH barge. Despite the magnetometer operator's conclusion, Combi Line continued its search upstream to check the reported location of the sinking of another object during the January 16, 1974 breakaway. Based on the magnetometer operator's evaluation, it was reasonable for Combi Line to conclude that the object upstream was not its barge. Combi Line was precluded from actually identifying either object by a diver because it was impossible to send a diver to investigate the object while conditions on the river were so dangerous. In a factual situation such as this, where an owner has made a diligent and good-faith search for his vessel but is precluded from identifying a wreck as his own—where everything that could reasonably have been done was done—the

standard supplied by the Fifth Circuit has been met. Combi Line has shown that its search was diligent and in good faith so as to comply with the obligation to search implied in 33 U.S.C. § 409.

Because Combi Line was innocent of fault in the sinking of the CBLL–01315, it had "the option of either raising the vessel [itself] and recovering the costs of removal from the party responsible for the sinking" —in this case, powers beyond human reach —"*or* of abandoning the vessel to the United States, which then bears the responsibility for deciding upon removal." *Nunley*, 727 F.2d at 460. Combi Line chose the latter course.

 Whether a sunken wreck has been abandoned is a question of fact. A valid abandonment may be accomplished by either an express or implied act of leaving or deserting property without hope of recovering it and without the intention of returning to it. 3A Norris, Benedict on Admiralty § 134 (7th ed. 1980). This determination is aided by a presumption under 33 U.S.C. § 414 that a sunken vessel has been abandoned if not removed within thirty days. *See Bunge Corp. v. Agri-Trans Corp.*, 542 F.Supp. 961, 969 (N.D.Miss. 1982), *aff'd. in part, vacated in part sub nom. Agri-Trans Corp. v. Gladders Barge Line, Inc.*, 721 F.2d 1005 (5th Cir.1983); *see also Jones Towing, Inc. v. United States*, 277 F.Supp. 839, 848 (E.D.La.1967) (where owner failed to remove sunken barge within thirty days after sinking, barge is presumed to have been abandoned to the United States by operation of law). There is no requirement for an official written "abandonment" rather than one which becomes effective by inactivity and passage of time. *Id.* at 849. Nor could there be, for as the United States Corps of Engineers' employees consistently testified at trial, there is no official procedure for abandonment. When Combi did not attempt within 30 days to retrieve the CBLL–01315, the location of which was unknown despite Combi's search, the company successfully abandoned the sunken vessel.

Combi Line's affirmative acts, such as the telex of Bastiaan Boll indicating that the company was unable to locate the vessel and considered it a total loss (Combi Exhibit 11) and the claim asserted with its hull insurers, support a finding of abandonment. By the time the M/V DAUNTLESS COLOCOTRONIS ran over the damned thing, the barge had not been Combi Line's property for over three years. Combi Line is therefore not liable for the damage to the DAUNTLESS: "If the non-negligent owner ... abandons the vessel to the United States, he is liable neither for the cost of removal nor for any damages suffered by third parties as a result of the wreck." *Nunley*, 727 F.2d at 460 (citing *Tennessee Valley Sand & Gravel Co. v. M/V DELTA*, 598 F.2d 930, 934 (5th Cir.1979)). Not only the claims of the DAUNTLESS interests, but also those of the United States of America for wreck marking and removal expenses must be dismissed under the Fifth Circuit's standard.

Tenneco Oil Company's claim for cargo damage, assigned to Combi Line during the litigation, is likewise dismissed, as are Combi's claims for contribution.

### B. *The Pollution Claim*

 The United States sought its recovery of oil clean-up costs directly against the owners of the M/V DAUNTLESS COLOCOTRONIS under 33 U.S.C. Section 1321(f). This statute provides the exclusive remedy for the Government against the owners of pollution discharging vessels. *In the Matter of Oswego Barge Corp.*, 664 F.2d 327, 344 (2nd Cir.1981); *United States v. Dixie Carriers, Inc.*, 627 F.2d 736, 742 (5th Cir.1980). The owners of the M/V DAUNTLESS COLOCOTRONIS would become subrogated to the rights of the United States Government under 33 U.S.C. Section 1321(g), if the oil discharge from DAUNTLESS' No. 5 cargo tank had been "caused solely by an act or omission of a third party." However, no such third-party liability exists in this case. Nor can fault in the oil spill be found in the DAUNTLESS. The discharge was caused, in fact, by the negligence of the United States government, which failed to perform its duties of wreck marking and removal

after Combi Line abandoned the CBLL–01315.

Although the DAUNTLESS interests have asserted that the United States government assigned to them a claim against Combi for pollution clean-up costs, there has been no showing of any payment to the United States government by the owners of the M/V DAUNTLESS COLOCOTRONIS for oil spill clean-up costs. Moreover, such a claim would only be valid, under traditional maritime tort law, if Combi had been negligent. *United States v. M/V BIG SAM*, 681 F.2d 432, 440 (5th Cir.1982), *reh'g. denied*, 693 F.2d 451, *cert. denied*, 462 U.S. 1132, 103 S.Ct. 3112, 77 L.Ed.2d 1367 (1983). The conclusion that Combi Line was without fault in the breakaway and sinking, and that it had abandoned the CBLL–01315 to the United States government long before the collision which caused the discharge, must lead to dismissal of any maritime tort claim for these expenses.

### C. *Combi Line's Prayer For Limitation Of Or Exoneration From Liability.*

Combi Line has petitioned for limitation of or exoneration from liability, under 46 U.S.C. § 183(a) which reads in part as follows:

> The liability of the owner of any vessel, whether American or foreign, ... for any loss, damage or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, *without the privity or knowledge of such owner or owners*, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending. (Emphasis added).

The burden of proof with respect to limitation actions was detailed in *In re Ferry GEORGE PRINCE*, 455 F.Supp. 272, 281 (E.D.La.1978):

> The determination of whether a shipowner is entitled to limit his liability is a two-step process. First, the Court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the Court must determine whether the shipowner had knowledge or privity of those *same* acts of negligence or conditions of unseaworthiness. For it is only knowledge of those factors which are found to have actually caused the accident, and not just any negligent acts or unseaworthy conditions, which preclude a shipowner's ability to limit. *Farrell Lines, Inc. v. Jones*, 530 F.2d 7 (5th Cir.1976). In determining this issue, the shipowner has the burden of proof in establishing a lack of privity or knowledge, while the initial burden of proving negligence or unseaworthiness rests on the claimants. *Tittle v. Aldacosta*, 544 F.2d 752 (5th Cir.1977)

In the present case, the claimants have failed to satisfy their initial burden of proving any negligence on the part of Combi Line which led to the accident. Thus, Combi Line is entitled to exoneration from liability.

### D. *Captain Nunley's Salvage Claim.*

 Walter D. Nunley has filed a claim *in rem* for salvage in the amount of $200,000.00 for services allegedly rendered to the DAUNTLESS and the Tenneco cargo following the July 22, 1977 casualty.

Salvage has been defined as:

> [T]he compensation allowed to persons by whose voluntary assistance a ship at sea or her cargo or both have been saved in whole or in part from impending sea peril, or in recovering such property from actual peril or loss, as in cases of ship wreck, derelict or recapture. *The SABINE*, 101 U.S. 384, (11 Otto) 384, 25 L.Ed. 982 (1880).

Further, "Three elements are necessary to a valid salvage claim: (1) a marine peril; (2) service voluntarily rendered *when not required as an existing duty or from a special contract;* (3) success in whole or in part, or that *the service rendered contributed to such success." Id.* (Emphasis added) *See also, W.P.L. Services, Inc. v. Bisso Towboat Company, Inc.*, 598 F.2d 417, 418 (5th Cir.1979). Captain Nunley has failed to establish the elements of sal-

vage, and accordingly, he is not entitled to an award.

The services rendered by Captain Nunley were not voluntary, but instead were part of a contract between the Coast Guard and, later, the DAUNTLESS interests on one hand and Chemlink on the other. On Friday, July 22, 1977, Captain Nunley, acting on behalf of Chemlink and in his capacity as Chemlink general manager, agreed to provide tugs, barges, pumps and manpower to pump water, slops and/or cargo from the DAUNTLESS' engine room, pumproom, cargo tanks or other flooded areas. Throughout dewatering efforts, Captain Nunley remained in the employ of Chemlink, procuring equipment to satisfy Chemlink's obligations and physically overseeing the work performed by the independent contract laborers hired by Chemlink. Indeed, repeatedly during his testimony, Captain Nunley admitted that his presence at the site of the DAUNTLESS during dewatering was in his Chemlink capacity. Captain Nunley did not succeed in establishing that he sporadically acted as an independent individual during the events of July 22 through 25, 1977.

In furtherance of Chemlink's agreement to dewater the DAUNTLESS, it was incumbent upon Chemlink to provide equipment satisfactory for this purpose. On Friday, July 22, 1977, Captain Nunley informed the DAUNTLESS' local agent Weeks that the Chemlink equipment on location could not dewater the engine room. He agreed Chemlink would provide semi-submersible hydraulic pumps from its Houston warehouse.

Late Sunday, July 24, when it became apparent that the Houston pumps were not en route, Captain Nunley continued to act in accordance with Chemlink's commitment to provide suitable pumps which he arranged in New Orleans. Captain Nunley was not acting as an individual, but in furtherance of Chemlink's obligation.

Similarly, Captain Nunley's starting of a Lister diesel pump (one with no electrical parts) in the engine room cannot be viewed as an act separate from Chemlink's agreement to provide *men* and equipment to

dewater the DAUNTLESS. Indeed, review of Chemlink's August 1, 1977, invoice (Estrella Exhibit No. 142) shows that owners were billed not only for the barge and tug at previously agreed prices, but that a charge was also made for onsite manpower. At no time did Captain Nunley's alleged services exceed the scope of Chemlink's contract. Because Captain Nunley did not voluntarily provide assistance to the DAUNTLESS, but rather acted in his official capacity as general manager of Chemlink in furtherance of Chemlink's engagement to dewater the ship, he is not entitled to a salvage award.

Captain Nunley's salvage claim fails on a second ground: the services rendered by Chemlink and Captain Nunley were not necessary to the removal of the ship from a condition of peril. In the early morning of July 25, 1977, before any Chemlink owned or procured equipment was placed aboard the DAUNTLESS, Captain ter-Meulen's readings indicated that he and the Coast Guard volunteers had stabilized the ship, causing her to gain freeboard. Although it is not necessary for danger to a ship to be "immediate or absolute" in order for a salvage award to be granted, a danger to the ship "which might expose her to destruction if the service were not rendered," is required. 3A Norris, Benedict on Admiralty § 65 (1980). In this case, Captain Nunley arrived on the scene too late to find the DAUNTLESS in danger of destruction were his services not rendered. "To put it pithily, 'no peril, no reward'." *Id.* at § 66. Having failed to meet the criteria for a salvage award, the claim of Captain Nunley against the Tenneco cargo and the M/V DAUNTLESS COLOCOTRONIS *in rem* must be dismissed. The third-party claims of the Tenneco cargo and the DAUNTLESS *in rem* against Combi Line for any salvage award are likewise dismissed.

All claims in these cases having been compromised or adjudicated, let judgment be entered in accordance with these findings and conclusions, and the M/V DAUNTLESS COLOCOTRONIS end her journey through the district court.

## JUDGMENT

Considering the record, the facts and the law applicable, the stipulations of counsel, and the findings and conclusions of the Court,

IT IS ORDERED, ADJUDGED and DECREED that there be judgment in favor of the defendant, Combi Line (Hapag-Lloyd A.G., Holland American Lines Freight B.V. and International Transport B.V.) and its insurer, the United Kingdom Mutual Steam Ship Assurance Association (Bermuda) Ltd., and against the plaintiffs, Estrella Leal Navagacion, S.A., Sea Unity Shipping, S.A., Assuranceforeninger Gard (the DAUNTLESS interests), Tenneco Oil Company, and the United States of America, dismissing the plaintiffs' claims at their cost;

IT IS FURTHER ORDERED, ADJUDGED and DECREED that there be judgment in favor of defendants, the M/V DAUNTLESS COLOCOTRONIS, her engines, tackle, apparel, etc., and 364,321 BARRELS OF ARABIAN LIGHT CRUDE OIL, *in rem*, and against the plaintiff, Walter D. Nunley, dismissing the plaintiff's claim at his cost;

IT IS FURTHER ORDERED, ADJUDGED and DECREED that the prayer of Combi Line (Hapag-Lloyd A.G., Holland American Lines Freight B.V., and International Transport B.V.) for exoneration from liability be GRANTED.

All other matters at issue in these consolidated cases having been previously disposed of, these cases are CLOSED.